MONROE, C. J.
Defendant, having been convicted of the murder of his wife and sentenced to death, prosecutes this appeal.
A number of bills of exception were reserved, during the trial, and all of the testimony taken in the case appears to have been brought up in connection therewith.
[1] 1. The first bill to which our attention is called was reserved, by defendant’s counsel, to the testimony of Mrs. Grace Cochran as to certain utterances of the decedent, after the infliction of the fatal wound. It appears that decedent and the witness were friends, and for about five months bad been occupying, respectively, the upper front room and the adjoining, or second, room of a two-story tenement, the two first floor rooms of which were occupied by another tenant; that defendant bad not lived with bis wife during that period; that the two women returned together to their apartment about midnight and retired to their respective beds about 1 o’clock, the door between the two rooms being left open, and the decedent being in the act of kneeling by her bedside and saying her prayers when the witness last saw her; that, about half past 2 o’clock the witness was awakened by the decedent, stand *961 ing, in her nightclothes, near the foot of her (the witness’) bed, calling to her — what she then said, as testified to by the witness, being the matter objected to, and, with some other testimony, given in the same connection, being as follows:
Examination in chief:
“Q. From her mother's home, where did you all go? A. We went straight home. Q. Now, what time did you go to bed, about? A. Around 12, or little after 12. Q. Were the doors open between your room and her room? (There appears to have been but one door.) A. Yes, sir. Q. Did you see Mrs. McLaughlin just before she went to bed? A. Yes, sir. * * * Q. What was she doing when you last saw her? A. Saying her prayers when I left her. Q. Now, then, did you go to sleep? A. Yes, sir; I went to sleep. Q. That was about what time? A. That was about — we got home a little after 12 — must have been close to 1 when we retired for the night. Q. * * * Now state how you woke up. A. I was awakened by Mrs. McLaughlin coming into the room.”
Counsel for defendant here announced that he intended to make an objection, and requested that the jury be retired; and it may be stated in this connection that the case was being tried for the second time, a prior conviction having been set aside upon the ground of newly discovered evidence. Hence the counsel and the court had reason to know what testimony to expect from the witness, who had testified on the first trial. The jury was accordingly retired; the witness was further examined, out of their presence; the judge ruled that the objection was not well taken; the testimony was repeated in the presence of the jury, and, so far as it need be here quoted, reads as follows:
“Q. Now_, have you any idea how long you had been in bed, or how long you had been asleep, about, when you heard Mrs. McLaughlin? A. Must have been in bed an hour or two hours. (Elsewhere, she says about an hour and a half, which was probably correct.) Q. What was the first thing that attracted your attention — what was the first thing that you noticed? A. Mrs. McLaughlin calling. * * * Q. -What was the first thing you saw when you woke up? A. Mrs. McLaughlin standing in the middle of the room. * * * Q. In the middle of her room, or your room? A. In the middle of my room. Q. * * * What was she doing at that time? A. Standing there. I says, Mary, are you calling me?’ She said: ‘Yes. Graeie, scream!’ And I says, ‘Scream, Mary? She said, ‘Yes, scream! Graeie, scream! scream!’ And, when I heard her say, ‘Screams Graeie,’ the third time, I jumped out of the bed and seen her in the middle of the floor, covered with blood, and I said, ‘My God! Mary; what is the matter — what happened?’ She said, ‘George — George.’ I said, ‘What George?’ She said: ‘George did it — George did it — George McLaughlin — he cut my throat.’ Q. What was her condition at that time, as to blood? A. The blood spurted out the throat like that; like you pull the faucet out of a cistern. * * * Q. When you first heard her scream and woke up— the first time you saw her — was she standing by your bed then? A. Yes, sir; right by the foot, between the bed and the table. * * * Q. What was the first thing that happened after she was standing there? A. After I grabbed her in my arms and put her in bed. Q. Before you grabbed her in your arms what happened? A. She told me who did it. Q. In what way did she tell you who did it; was she still talking clearly, or screaming, or what? A. Gasping. Q. What was the exact language she used when she told you that; what were her words? A. I-Ier words was, ‘Graeie, scream! scream! Gracie, scream!’ When I heard her say ‘Scream’ the third time, I jumped out of the bed. When I saw her covered with blood, I said, ‘My God, Mary, what’s the matter?’ She said, ‘George did it.’ I said. ‘What George; what did he do?’ She said: ‘George did it — George did it — George McLaughlin — he cut my throat.’ ”
The following, with other matter, appears in the cross-examination:
“Q. And you went to bed about 1 o’clock? A. Yes, sir. Q. What time was it when you woke up and saw Mrs. McLaughlin in the middle of the room? A. Must have been about half past 2 — around that. Q. Do you know when she was cut? A. No, sir; I don’t know when she was cut. Q. Do you know how long after she was cut that you heard her screaming? A. No, sir. Q. Are you very deaf? A. Yes, sir. Q. Weren’t you deaf at that time? A. I was deaf, but not as deaf as I am; could hear a great deal better than I do; I wasn’t deaf then as I am now. Q. How far from the bed was she standing,? A. As far as you are to me, by the foot of the bed. Q. How long had she been standing there; do you know? A. No, sir; I don’t know. Q. And you don’t know when she was cut or how she was cut? A. No, sir; I do not.”
The objection of the counsel which is here insisted on, and the reasons of the court for overruling the same, are stated as follows:
“Be it further remembered that, at the time the said witness was narrating what had taken | place, and what statement had been made by *963 the deceased, in order to lay the predicate for the admission of what was claimed to be the res gestse, the jury were retired; that the jury were returned into court, and counsel for defendant urged the objection that the statement made was not part of the res gestee; that it was not a part of the transaction; that it was not the transaction speaking by the distinctive words of the participants, or one of them; that the occurrence was over, and for how long a time the witness did not know, nor was able to say; neither was it a dying declaration, because the deceased did not, at that time, say that she expected to die; and, therefore, it was not admissible, either as part of the res gestm or as a dying declaration,
“Per Curiam. This testimony was admitted because I wees convinced that it was part of the res gestm. The declaration of the deceased was evidently made a very few minutes after her throat was* cut. I-Ier physical condition, at that tinie, and the circumstances under which the declaration was made, when considered in connection with the testimony of Mrs. Cochran and Dr. O’Hara, the coroner, I think, showed, beyond any doubt, that it was spontaneous in-character, and precluded the probability of Emy premeditation or fabrication. The testimony of Mrs. CochrEm and Dr. O’Hara is made part of the bill.”
We gather from the testimony of the coroner that Mrs. McLaughlin died in the afternoon of the day following that upon which she received the wound, and as the result of hemorrhage therefrom; that—
“the cut began between the first and second vertebrae, * * * and extended around the right side of the neck, on a straight line, amd wound up a half inch to the right of the Adam’s apple; did not go into-the apple at all; cut the muscle sind nerves and lymphatic glands and fat and external and internal jugular veins”; that a wound of that character would produce “considerable shock, and the shock would develop as loss of blood goes on”; that, from a woman such as the deceased, the blood would probably spurt from such a wound “about four, five, six inches.”
The “rule rejecting assertions, offered testi'monially, which have not been, in some way, subjected to the test of cross-examination” is based, upon the theory—
“that the many possible deficiencies, suppressions, causes of error, and untrustworthiness which underlie the bare, untested, assertion of a witness may be best brought to light and exposed by the test of cross-examination.” Wigmore on Evidence, vol. 2, § 1862.
But the author, thus quoted, points out 14 exceptions to the rule thus mentioned, beginning with “Dying Declarations,” and ending (according to a, certain classification) with “Spontaneous Exclamations,” the underlying principle of which he states to be that it may be sufficiently clear, in the instances constituting the exceptions, that the assertions, offered in evidence, are free from the risk of inaccuracy and untrustworthiness, and hence that the test of cross-examination would be a work of supererogation.
“Moreover [he continues] the test may be impossible of employment — for example, by reason of the death of the declarant — so that, if his testimony is to be used at all, there is a necessity for taking it in the untested shape. * * *
“Where the test of cross-examination is impossible of application, * * * we are faced with the alternative of receiving his statements without that test, or leaving his knowledge altogether unutilized; and the question arises whether the interest of truth would suffer more by adopting the latter or the former alternative. Whatever might be thought of the general policy of choosing the former alternative, without any further requirement, it is clear, at any rate, that, so far as, in a given instance, some substitute for cross-examination is found to have been present, there is ground for making an exception. The mere necessity, alone, of taking the untested statement, instead of none at all, might not suffice; but if, to this necessity, there is added a situation in which some degree of trustworthiness, more than the ordinary, can be predicated of the statement, there is reason for admitting it, as, not merely the best that can be got from the witness, but better than could be ordinarily expected without the test of cross-examination. * « * There are many situations in which' it can be easily seen that such a required test would add little as a security, because its purposes have been already • substantially accomplished.” Id. §§ 1426-1426.
In liis luminous exposition of the doctrine of the admissibility in evidence, under certain circumstances, of spontaneous exclamations, though their verity be not tested by cross-examination of the utterer, the same learned author says:
“The general principle of this exception to the hearsay rule is based on the experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere *965 response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or at least as lacking in the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker’s belief as to the facts just observed by him, and may therefore be received as testimony to those facts.” Id. vol. 3, § 1747, p. 2250.
“ * * * There must be some shock, startling enough to produce the nervous excitement and render the utterance spontaneous and unreflecting, * * * The utterance must have been before there has been time to contrive and misrepresent; i. e., while the nervous excitement may be supposed still to dominate and the reflective powers still to be in abeyance. It is to be observed that the statements need not be strictly contemporaneous with the exciting-cause; they may be subsequent to it, provided there has not been time for the exciting influence to lose its sway and be dissipated. The fallacy, formerly entertained by a few courts, that the utterance must be strictly contemporaneous, owes its origin to a mistaken application of the ‘verbal act’ doctrine.”
It is pointed out that, under the “verbal act” doctrine, the utterance must accompany the act; otherwise it does not become part of the act; as, for instance, one claiming possession of land, as owner, must assert his title, while in possession, and it will not do to make the assertion afterwards. But, for the purposes of the exception under consideration, the spontaneous exclamation is offered, not as part, but as evidence, of the act asserted, and the only condition is that it should be the natural effusion of a state of exciteinent, produced by the act, and which has continued after the act has ended.
“It is therefore an error [says the author] to apply to the present exception the verbal act rule that the utterance must be precisely contemporaneous with the act or occurrence. There, was. in the beginning, a tendency to commit this error. But at the present day this error seems to have been almost everywhere repudiated.”
Referring to certain “persisting traces” of the error thus referred to, he says:
“(c) Thirdly, in the courts where this borrowed doctrine of strict contemporaneity still appears, the inclination is to stigmatize an excluded declaration as ‘narrative,’ this term be- ■ ing used as an assertion of a past fact. This test of exclusion is, of course, unsound, because, practically all the utterances under the present exception are ‘narrative’ in the sense of an assertion of a past fact. The statements, constantly admitted, of the circumstances of a homicidal quarrel, or of a railroad collision, are commonly of facts occurring prior to the time of the utterance; and, wherever such are admitted, it must be in spite of their being ‘narrative.’ * * * The term ‘narrative’ serves merely to mislead, and should be discarded.
“(d) Fourthly, the confusion between the verbal act doctrine, of strict contemporaneity, and the liberal time allowance of the present exception * * * left its mark in England, in the shape of a long and somewhat acrimonious controversy over the ruling in Reg. v. Bedingfield, Id. 1756, p. 2265.”
The case thus mentioned is cited by defendant’s counsel and, stated briefly, was as follows :
The defendant had threatened to kill the deceased by cutting her throat. They were in a room together in her house. He went out, and she was found lying senseless on the floor, her head resting on a footstool. He went to a “spirit shop” and bought some spirits; which he took into the room. In a minute or two the deceased came out of the room with her throat cut, and, meeting a woman in her employ, said something to her, and pointed backwards towards the house. In a few minutes she was dead. The prosecution offered to prove whatj she said, but, Cockburn, O. J., held it to be inadmissible, saying:
“Anything uttered by the deceased at the time the act was being done would be admissible, as, for instance, if she had been heard to say something as, ‘Don’t Harry.’ But here it was something stated by her after it was all over, whatever it was, and after the act was completed.”
In a note to the above citation, Prof. Wig-more expresses the opinion that the ruling was erroneous, and will “almost certainly not be followed in this country,” and cites Edson on Evidence (3d Ed., London, 1902) p. 49, to the effect that it was generally thought the Chief Justice had applied the rule too strictly. He, further, in connection with his comments upon the, not uncommon, practice *967 of admitting, as evidence, under the doctrine of res gestee, utterings or happenings merely because they have occurred at the time something else was going on, says, of the Bedingfield Case, that it is typical of the cases representing the stricter construction of that doctrine, and that:
“In a mixed phraseology of verbal act and res gestee language, the court argue out the arbitrary and insoluble question, whether the declaration is ‘a part of the transaction’ and ‘contemporaneous with it,’ adopting the strictest view of what constitutes the ‘transaction’ and of what may bo said to be ‘contemporaneous.’ ”
And, as an 'instance of the looser construction of the same doctrine, he cites a ease in which it was held that the declarations of a voter as to his qualifications, if made at the time of voting, are competent as part of the res gestae. We have thus considered at some length the view expressed upon the question here at issue in the latest and most thoroughly analytical work upon the law of evidence which has comq within our observation, because it appears to us to be the true view of that question, and finds the strongest support among the jurists and the text-writers, though frequently so entangled with other doctrines or rules as to be rendered difficult of comprehension. That distinguished publicist Dr. Wharton, for instance, states, in one place:
“If we are to receive declarations made 10 minutes after a transaction, we must receive declarations made 10 years afterwards.”
And, in another place:
“The distinguishing feature of declarations of this class is that they should be necessary incidents of the litigated act; necessary in this sense: That they are part of the immediate concomitants or conditions of such act, and are not produced by the calculated policy of the actor. In other words, they must stand in immediate causal relation to the act and become part either of the action immediately producing it or of the action which it immediately produces. Incidents that are thus immediately and unconsciously associated with an act, whether such incidents are doings or declarations, become in this way evidence of the character of the act. Under the rule before us, evidence in homicide trials has been received [omitting some cases mentioned] of statements of the deceased at the time, or so soon before, or afterwards as to preclude the hypothesis of concoction or premeditation, charging the defendant with the act.”
It will be seen from the foregoing that, after all, the question is, not whether the exclamation or statement is made contemporaneously with the act, or “immediately” before or after, it (which is much the same thing since “immediately” means “without interval of time”), but, whether it was a spontaneous and unreasoned expression superinduced by a state of mind created by the act and continued from the moment of such creation to that of the utterance of the expression.
As said in Hill’s Case, 2 Grat. (42 Va.) 594 (cited in Wigmore on Ev. vol. 3, p. 2254):
“A priori a stab in the heart would instantaneously suspend the powers of reflection. * * All the time then from receiving the stab until he revived from his fit of fainting he was clearly not in a condition to arrange his ideas and fabricate a story. * * * All that is necessary * * * to make the declaration part of the res gestee is that it should be made recently after receiving the injury, and before he had time to make up a story, ‘or to devise anything for his own advantage.’ ”
And, in Travelers’ Ins. Co. v. Sheppard, 85 Ga. 751, 775, 776, 12 S. E. 18, 26, 27, (Id. p. 2256):
“What the law altogether distrusts is, not afterspeech but afterthought. * * That the declarations shall be or appear to be spontaneous is indispensable, and it is for this reason alone that they are required to be speedy.”
In Vicksburg R. Co. v. O’Brien, 119 U. S. 99, 7 Sup. Ct. 118, 30 L. Ed. 299 (similarly cited, page 2255) Mr. Justice Field, as the organ of the court, said:
“As the declaration was made between 10 and 30 minutes after the accident, we may well conclude that it was made in sight of the wrecked train, and in presence of the injured parties, and whilst surrounded by excited passengers. * * s- ^e modern doctrine has relaxed the ancient rule that declarations, to be admissible as part of the res gestee, must be strictly contemporaneous with the main transaction. It now allows evidence of them, when they appear to have been made under the immediate influ *969 ence of the principal transaction, and are so connected with it as to characterize or explain it. * * * The admissibility of a declaration, in connection with evidence of the principal fact, * * * must be determined by the judge according to the degree of its relation to that fact, and in the exercise of a sound discretion; it being extremely difficult, if not impossible, to bring this class of eases within the limits of a more particular description.”
In State v. Foley, 113 La. 52, 36 South. 885, 104 Am. St. Rep. 493, it appeared, that a police officer, hearing shots and seeing the flashes, ran a distance of 400 feet, and, finding a man lying wounded, asked him who shot him, to which the wounded man replied, “Foley shot me, without cause or provocation.” And it was held by this court, after a careful review of the jurisprudence, that the statement so made was admissible against Foley when afterwards tried for the murder.
Applying what we conceive to be the true doctrine to the facts here disclosed, we are satisfied that a woman who is awakened in the night, by the cutting of her throat, or whose throat is cut after she is thus awakened, is in no condition, with the blood spurting, four, five, six inches,” from the severed jugular veins as from a cistern with the faucet turned, either to remain quiet, without seeking the assistance which was within 10 feet of her, or to concoct any scheme for the purpose of deceiving the friend from whom such assistance was to be obtained. We, therefore, conclude that the objection here under consideration was properly overruled.
[2] 2. It appears that the witness Mrs. Cochran was permitted to testify, over defendant’s objection, that, after she had assisted in getting the wounded woman upon her (Mrs. Cochran’s) bed, she went downstairs to call assistance, and then to different places, to call a priest and also the mother and sister of Mrs. McLaughlin; one purpose of the testimony being, with the aid of other testimony, to fix the time at which the assault was committed.
The objection was properly overruled.
[3] 3. Mrs. Cochran was also permitted to testify over defendant’s objection that defendant had lived with the deceased, in the house in which the assault was committed, prior to the time at which the witness went there to live, and that, upon the night of the assault, there was an oil lamp burning in her room, the door from which into the room occupied by the decedent was open.
The testimony was relevant as tending to show that the defendant knew how to get into, and out of, the house and that the decedent might have recognized him, when the assault was committed, by the light from the lamp.
[4] 4. John Norris, Bertillon operator in the office of the chief of detectives, was permitted to testify, over objection, that, on the day of defendant’s arrest, which was the day of the homicide he, with the assistant chief of detectives, visited defendant, then in prison, and “took the scrapings from his finger nails, between the flesh and the finger nails, the dirt of the left and right hands”; that he placed the scrapings from the two hands, respectively, in separate envelopes, identified the envelopes, and turned them over to the assistant chief.
The statement per curiam is that the scrapings were taken in order to ascertain whether they contained human blood, and that it was shown on the trial that they did; also that defendant had no reason to complain, as he offered evidence to show that he had had a fight on the night of the homicide, and that his hands were covered with blood and his shirt a little stained therewith.
The testimony was properly admitted, and its admission violated no constitutional right of the defendant. State v. Aspara, 113 La. *971 940, 37 South. 883, and authorities there cited.
5. The testimony of William Reich and B. J. Daly was properly admitted to show what disposition was made of the envelopes containing the scrapings from defendant’s nails.
6. And the testimony of Dr. A. L. Metz, official chemist of the city of New Orleans, was properly admitted to show that the envelopes were delivered to him; that he analyzed their contents and found human blood in the “scrapings” indicated as having been taken from the right hand.
[5] 7. In his closing argument, the district attorney made the statement:
“The facts of the case show that George McLaughlin went up, by the fence, on to the gallery, into the front room, and cut this woman’s throat.”
To which, it was objected, that there was no evidence to show that defendant entered the house in the manner stated, and that the statement was therefore unauthorized, and the judge was requested so to instruct the jury. The statement attached to the bill by the judge is as follows:
“The court has no right to instruct the jury as to what evidence was before them at all. The court does not understand the district attorney to assert that any one stated, as a fact, that he had seen George McLaughlin come up by the fence on to the gallery. The district attorney is arguing to the jury his idea as to what the facts in the case show and what conclusions are justified from those facts, as I understand, states to the jury that, in his opinion, the facts in the .case establish these things to have been proven'. Now whether they do or not is a question for the jury to . decide, and not for the court. I think it is legitimate argument, and • whether the inference is justified or not is entirely dependent upon the facts before the jury; the jury are to decide whether the facts establish the district attorney’s conclusion or not”
We find no error in the ruling so made. There is evidence in the record tending to show that access to the room occupied by deceased might have been, and, probably was, obtained in the manner stated by the district attorney,- and he was authorized to draw his own inferences therefrom. On the other hand, it was no part of the duty of the judge to call the attention of the jury either to the presence or alleged absence of such evidence.
[6] 8. Defendant’s counsel requested the following special charge:
“The court instructs the jury that testimony with regard to verbal statements should be received with great caution. The evidence, consisting, as it does, in the mere recapitulation of oral statements, is subject to much imperfection and mistake, in consequence of the person speaking not having clearly expressed his own meaning, or in consequence of the witness having misunderstood. It frequently happens that the witness, by unintentionally altering a few of the expressions, orally used, the statement becomes completely at variance with what the person did in fact say. Such kind of testimony should be scanned closely. Where precise words are shown, by intelligent and reliable witnesses, they often lead to satisfactory conclusions, but, where a witness can only give what he thinks is the substance of what was said, the weight to be given to such testimony depends largely upon the strength of memory and intelligence of the witness.”
The requested charge was properly refused, on the ground that the question of the weight and sufficiency of the evidence was not for the judge to determine, and that he was unauthorized to give undue prominence to any class of evidence.
[7] 9. In a bill reserved to the overruling of a motion for new trial, defendant relies upon.the two grounds:
(1) That “9 members and a quorum” of the grand jury, instead of the whole number (12), concurred in finding the indictment, whereas the law requires the concurrence of the whole number.
(2) That tales jurors were drawn for the purpose of the trial, by the criminal sheriff, during a recess of the court, whereas the law requires that they shall be drawn in open court and by lot; and, that, his peremptory challenges having been exhausted, defendant was compelled to accept one Sydney Ellis, a juror so drawn.
The first of the grounds above stated was disposed of by this court adversely to de *973 fendant’s contention, in the recent case of State v. Walker, 137 La. 197, 68 South. 407, and we find no reason for overruling that decision.
[8] As to the second ground, the minutes of March 23, 1915, show that an order was made, in section A of the criminal district court, that:
“One hundred fifty tales jurors [be] drawn from the jury wheel, in conformity to law, 50 of said tales jurors made returnable before section A * * * at 4 o’clock p. m., and 100, at 7:30 p. m. on this, Tuesday, March 23, 1915.”
The minutes also show that the jury was completed and Sydney Ellis accepted from the list of tales jurors on the same day.
■ There is testimony to the effect that the tales jurors were drawn during the recess of the court, and, as there is no evidence to the contrary, it must be presumed that the manner of the drawing was that provided by law. We find nothing in the law which requires that tales jurors shall be drawn in the parish of Orleans, in open court. Act 138 of 1877 (page 209) provides that—
“ * * * the judge shall enter an order on the minutes directing the criminal sheriff, or one of his deputies, to draw such number of tales jurors as, in the opinion of the court, may be necessary to complete the jury, from the jury wheel. * * * ”
And Act 24 of 1878 (Ex. Sess.) § 3, p. 282, after providing for the impaneling of petit jurors, contains the following:
“And provided, also, in ease the said panel should be exhausted, the names of the tales jurors drawn in conformity with existing laws shall be placed by said criminal sheriff in said box, and shall, by him, be drawn in open court, by lot,” etc.
A similar provision is to be found in section 5 of Act 98 of 1880, pp. 125, 126.
The drawing in open court, and by lot, thus provided for, is the drawing which takes place in the process of impaneling the jury, and we do not understand defendant’s counsel to be complaining of that drawing. If, however, the complaint is so directed, it came too late, as would the complaint that the drawing (from the general venire box) was made during recess, save that it is alleged that defendant and Ms counsel were unaware that it was so made.
[9] We are requested by counsel for the state to pass upon the correctness of the ruling of the trial judge in overruling their objection to certain testimony offered in behalf of defendant, on the second trial, but as that ruling can, in no manner, affect the result in this case, we deem it better not to comply with the request.
Eor the reasons thus assigned, the verdict and sentence appealed from are affirmed.
See dissenting opinion of O’NIELL, J., 70 South. 930.