[Crim. No. 5391. In Bank. July 7, 1953.]

THE PEOPLE, Respondent, v. MARION JOAN
HAEUSSLER, Appellant.

Cornwall & Westwick for Appellant.

Edmund G. Brown, Attorney General, Frank Richards, Deputy Attorney General, Roy A. Gustafson, District Attorney (Ventura), and Donald L. Benton, Deputy District Attorney, for Respondent.

EDMONDS, J.—Marion Joan Haeussler was tried before a jury upon charges of manslaughter in the driving of a vehicle (Pen. Code, § 192[3]) and of committing an unlawful act while driving a vehicle under the influence of intoxicating liquor. (Veh. Code, § 501.) Following her conviction on both counts, the imposition of sentence was suspended and she was admitted to probation. By section 1237 of the Penal Code, an order granting probation is a "final judgment of conviction" for the purpose of appeal.

At about 1 a.m., a Buick convertible automobile operated by Mrs. Haeussler collided with a Mercury sedan driven by Vernon Lovelace in which Edward Amsel and Wayne Goff were riding. Amsel was killed and Lovelace and Goff were injured. Mrs. Haeussler also sustained injuries.

The accident occurred on a level highway about 20 feet wide with two lanes. Driving west, Lovelace observed the lights of the Buick as it came around a curve, apparently in the wrong lane. The car continued its course, the lights remaining undimmed. In an attempt to avoid a collision, he applied his brakes and swerved sharply to his left. Mrs. Haeussler's car struck the right side of the Mercury.

An officer of the California Highway Patrol, who arrived at the scene of the accident a few minutes later, inspected the automobiles and took measurements of the skid marks on the pavement. At the trial and over objection, he gave his opinion of the point of impact as being in the westbound lane, about 21 inches from the center line. He also testified that there was an odor of alcohol on Mrs. Haeussler's breath.

The injured persons were taken to an emergency hospital. There, while Mrs. Haeussler was unconscious, an attendant withdrew from her arm five cubic centimeters of blood. Four of these were used to type her blood for a transfusion. The remainder was given to a laboratory technician for analysis.

Objections to the technician's testimony concerning his findings were overruled. He stated that the alcohol content of the blood was about .180 per cent. A medical expert testified that intoxication may occur when the amount of alcohol in the blood is between .050 and .150 per cent, but all individuals whose blood contains alcohol in an amount greater than the latter figure are unable to drive safely. According to his estimate, the alcohol content of Mrs. Haeussler's blood at the time of the accident was about .215 per cent.

As grounds for a reversal of the judgment, Mrs. Haeussler claims that the admission of testimony concerning the results of the blood test taken without her consent deprived her of due process of law. Other contentions are that the trial court erred in permitting a mechanic to state his opinion in regard to the speedometer reading of one of the cars and in admitting the highway patrolman's opinion testimony concerning the point of impact. She also argues that the court erred in its rulings upon instructions to the jury. Finally, she asserts, the trial was conducted in a manner which favored the prosecution.

Mrs. Haeussler bases her claim of a denial of due process upon *Rochin* v. *California*, 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396]. In the Rochin case, the record showed that police officers, in search of narcotics, invaded

the defendant's room without a warrant. Seeing Rochin put two capsules into his mouth, the officers "jumped upon" him and attempted to remove the objects. Unsuccessful, they took him, handcuffed, to a hospital where, by means of a tube, an emetic was injected into his stomach, causing him to vomit the capsules. Upon analysis, they were found to contain morphine.

In a trial upon the charge of unlawfully possessing narcotics (Health & Saf. Code, § 11500), the capsules were the chief evidence against Rochin. The United States Supreme Court reversed the judgment of conviction, saying: "we are compelled to conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that shocks the conscience. Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation." (P. 172.)

Counsel for Mrs. Haeussler reads the Rochin decision as holding that any taking of evidence, by force, from the person of a defendant without his consent violates due process. In the present case, it is said, such force consisted of puncturing her skin with a needle to withdraw blood. But even if the decision does not condemn all forcible taking of real evidence, the argument continues, it precludes the use of any which is obtained by a forcible entry into the defendant's body.

The court in the Rochin case approved prior decisions which declare that due process, as that term is used in the Fourteenth Amendment, does not embody all of the rights enumerated in the first eight amendments, but only those immunities which are "so rooted in the traditions and conscience of our people as to be ranked as fundamental" or are "implicit in the concept of ordered liberty." (P. 169.)

That the privilege against self-incrimination is not one of the immunities implicit in due process was decided in *Twining* v. *New Jersey*, 211 U.S. 78 [29 S.Ct. 14, 53 L.Ed. 97], and reaffirmed in *Adamson* v. *California*, 332 U.S. 46 [67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223]. However, the privilege is guaranteed by the Constitution of this state, which declares that "[n]o person shall . . . be compelled, in any

criminal case, to be a witness against himself.'' (Cal. Const., art. I, § 13.) Reviewing the scope and purpose of that provision, this court said in *People* v. *Trujillo,* 32 Cal.2d 105 [194 P.2d 681] : ''Wigmore, in an exhaustive and scholarly discussion of the history and policy behind the provision of the federal Constitution, which is substantially the same as the California mandate, concludes that the object of the protection 'is the employment of legal process to *extract from the person's own lips* an admission of his guilt, which will thus take the place of other evidence. . . .

'' 'In other words, it is not merely any and every compulsion that is the kernel of the privilege, in history and in the constitutional definitions, but *testimonial compulsion.*' '' (P. 112.)

This statement of the rule is consistent with that of the United States Supreme Court (*Holt* v. *United States,* 218 U.S. 245 [31 S.Ct. 2, 54 L.Ed. 1021] ; *United States* v. *White,* 322 U.S. 694 [64 S.Ct. 1248, 88 L.Ed. 1542, 152 A.L.R. 1202]) and the courts of other jurisdictions which, in analogous factual situations, have concluded there was no violation of the privilege. (*State* v. *Green,* 121 S.C. 230 [114 S.E. 317] [placing defendant's foot in footprint found at scene of crime] ; *State* v. *McLaughlin,* 138 La. 958 [70 So. 925] [scrapings taken from beneath accused's fingernails] ; *Biggs* v. *State,* 201 Ind. 200 [167 N.E. 129, 64 A.L.R. 1085] [removing defendant's shoes to match footprints] ; *State* v. *Aspara,* 113 La. 940 [37 So. 883] [removing defendant's clothing for comparisons and tests] ; *Ash* v. *State,* 139 Tex.Crim. Rep. 420 [141 S.W.2d 341] [giving accused an enema to recover swallowed jewelry] ; *United States* v. *Kelly,* 55 F.2d 67 [taking fingerprints of accused] ; see anno. 164 A.L.R. 967 ; Inbau, Self Incrimination [1950].)

 Evidence is not obtained by testimonial compulsion where it consists of a test of blood taken from an accused. It is not a communication from the accused but real evidence of the ultimate fact in issue—the defendant's physical condition. (*State* v. *Cram,* 176 Ore. 577 [160 P.2d 283, 289, 164 A.L.R. 952] ; *State* v. *Sturtevant,* 96 N.H. 99 [70 A.2d 909, 911-912] ; *State* v. *Ayres,* 70 Idaho 18 [211 P.2d 142, 144] ; *State* v. *Alexander,* 7 N.J. 585 [83 A.2d 441, 445] ; *Block* v. *People,* 125 Colo. 36 [240 P.2d 512, 515-516], cert. den. 343 U.S. 978 [72 S.Ct. 1076, 96 L.Ed. 1370].)

258

Similarly, real evidence obtained from a defendant's stomach by use of an emetic is not violative of the privilege against self-incrimination. Despite contrary suggestions, the majority of the court in the Rochin case did not rest its reversal of the conviction upon that ground. (See the concurring opinions of Justices Black and Douglas, 342 U.S. 165, 174, 177.) Nor did the court overrule or limit earlier cases which define the scope of the privilege or exclude that privilege from the operation of the due process clause of the Fourteenth Amendment. Accordingly, no changes in the rules stated and applied in those cases may be presumed.

More pertinent to the present inquiry is the prohibition against unlawful searches and seizures stated in the Fourth Amendment to the federal Constitution and in the California Constitution. (Art. I, § 19.) In *Wolf* v. *Colorado,* 338 U.S. 25 [69 S.Ct. 1359, 93 L.Ed. 1782], the applicability of the due process clause of the Fourteenth Amendment to that prohibition was considered. Freedom from unlawful intrusion was held to be basic to a free society and, being implicit in the concept of ordered liberty, enforceable against the states through the due process clause.

In prosecutions in the federal courts, an accused may, upon timely motion, obtain an order suppressing evidence obtained from him unlawfully. But the court in the Wolf case expressly stated that this method of enforcement is not obligatory upon the states. Recognizing that the primary effect of such a remedy is to protect the person incriminated by such evidence, in opposition to the interests of society in the detection and punishment of criminal acts, the court said: "We cannot . . . regard it as a departure from basic standards to remand such persons, together with those who emerge scatheless from a search, to the remedies of private action and such protection as the internal discipline of the police, under the eyes of an alert public opinion, may afford. Granting that in practice the exclusion of evidence may be an effective way of deterring unreasonable searches, it is not for this Court to condemn as falling below the minimal standards assured by the Due Process Clause a State's reliance upon other methods which, if consistently enforced, would be equally effective." (P. 31.)

Without deviation, this court has held that competent evidence, although improperly obtained, is admissible in a criminal prosecution against the person from whom the evidence is taken. (*People* v. *Kelley,* 22 Cal.2d 169, 172 [137

P.2d 1]; *People* v. *Gonzales,* 20 Cal.2d 165, 169 [124 P.2d 44]; *People* v. *Mayen,* 188 Cal. 237 [205 P. 435, 24 A.L.R. 1383].)

Elements of unlawfulness in the acquisition of evidence were present in the Rochin case, the initial entry and search being without the authority of a warrant. However, the basis for the decision is not that the evidence was acquired illegally. Reversal of the judgment upon that ground would have been contrary to the Wolf case, and it is not to be supposed that the Supreme Court would make such a startling change in constitutional doctrine without mention of that decision.

The essence of the Rochin decision is in the court's reference to *Brown* v. *Mississippi,* 297 U.S. 278 [56 S.Ct. 461, 80 L.Ed. 682], and other coerced confession cases. In the Brown case, a conviction based upon a confession obtained by torture was reversed because such a practice amounted to a wrong "so fundamental that it made the whole proceeding a mere pretense of a trial and rendered the conviction and sentence wholly void." (P. 286.) So, in the Rochin case, the court said: "Use of involuntary verbal confessions in State criminal trials is constitutionally obnoxious not only because of their unreliability. They are inadmissible under the Due Process Clause even though statements contained in them may be independently established as true. Coerced confessions offend the community's sense of fair play and decency. So here, to sanction the brutal conduct which naturally enough was condemned by the court whose judgment is before us, would be to afford brutality the cloak of law. Nothing would be more calculated to discredit law and thereby to brutalize the temper of a society." (Pp. 173-174.) In brief, the Rochin case holds that brutal or shocking force exerted to acquire evidence renders void a conviction based wholly or in part upon the use of such evidence.

Contrary to Mrs. Haeussler's contention, the Rochin decision does not rest upon the premise that the taking of evidence from the person of a defendant or by entry into his body is the decisive factor. Instead, the entire course of conduct was examined and found to be brutal and shocking. The court disclaimed any intent to fix rigidly the confines of due process by asserting that they must remain "indefinite and vague." That blood tests and similar techniques may stand against constitutional objection is suggested by the statement: "We therefore put to one side cases which have arisen

in State courts through use of modern methods and devices for discovering wrongdoers and bringing them to book. It does not fairly represent these decisions to suggest that they legalize force so brutal and so offensive to human dignity in securing evidence from a suspect as is revealed by this record.'' (P. 174.)

The taking of a blood test, when accomplished in a medically approved manner, does not smack of brutality. In recent years, millions of young men have been subjected to such tests as an incident to induction into military service. In this state, a blood test is required of each person making application for a marriage license (Civ. Code, § 79.01) and physicians engaged in prenatal care of a pregnant woman, or attending such woman at the time of delivery, must obtain a sample of her blood for purposes of a test for venereal disease. (Health & Saf. Code, § 21402.) Moreover, in the present case, Mrs. Haeussler was unconscious at the time the blood was withdrawn, and the removal of four of the five cubic centimeters was necessary to provide medical treatment. The only unauthorized action of the medical attendant was to remove one additional cubic centimeter of blood after the hypodermic needle already had been inserted. Certainly, this conduct cannot be characterized as shocking to the conscience, and it does not support Mrs. Haeussler's claim of a violation of due process of law.

Another point relied upon is that the testimony of the highway patrolman relative to the point of impact was not upon a matter subject to expert testimony and should not have been received. But, as was said in *Zelayeta* v. *Pacific Greyhound Lines*, 104 Cal.App.2d 716 [232 P.2d 572] : ''It is quite obvious that the conclusion, based upon the facts of a particular case, as to just where a collision between two vehicles occurred, may be so obvious that any reasonable person, trained or not, can draw that inference from the facts. It is equally clear that cases may occur where the opinions of trained experts in the field on this subject will be of great assistance to the members of the jury in arriving at their conclusions. In such cases a traffic officer who has spent years investigating accidents in which he has been required to render official reports not only as to the facts of the accidents but also as to his opinion as to their causes, including his opinion, when necessary, as to the point of impact, is an expert. Necessarily, in this field, much must be left to the common sense and discretion of the trial court.'' (P. 727.)

In the present case, the officer's qualifications as a witness included many years of experience in investigating traffic accidents and reporting their causes to his superiors. He based his opinion upon an inspection of skid and gouge marks on the pavement and the location of oil, broken glass, parts of the vehicles, and other debris. The trial court was justified in concluding that a determination, from these indicia, as to the point of impact might properly be made by an expert.

It is also argued that the trial court committed prejudicial error in permitting the prosecution's witness, a mechanic, to give opinion testimony relative to a broken speedometer on the Lovelace car. This testimony was in response to evidence offered by Mrs. Haeussler tending to prove that, after the accident, the speedometer was broken and its needle fixed at a point indicating a speed of 78 miles per hour. The mechanic testified that a severe impact might cause the needle to become fixed at any point, regardless of the speed at which the car had been traveling.

This witness was qualified as an expert by evidence that he had been a speedometer mechanic for several years. No attempt was made by counsel for Mrs. Haeussler to cross-examine him concerning his qualifications nor was any request made to take the witness on *voir dire*. Generally, it is for the trial court to determine the competency and qualification of a witness to state an opinion, and upon appeal its ruling will not be disturbed in the absence of a manifest showing of abuse of discretion. (*Huffman* v. *Lindquist*, 37 Cal.2d 465, 476 [234 P.2d 34].) None was shown here.

Objection is made to the definition of "under the influence of intoxicating liquor" given in instructions to the jury. They were told that it was unnecessary to find that Mrs. Haeussler was "drunk" or "intoxicated"; it would be sufficient if it were found that intoxicating liquor had "so far affected the nervous system, brain or muscles as to impair to an appreciable degree the ability to operate the vehicle in a manner like that of an ordinarily prudent and cautious person in the full possession of his faculties, using reasonable care and under like conditions." The degree to which a person must be influenced by alcohol to warrant a conviction under section 501 of the Vehicle Code is correctly stated in the instruction. (*People* v. *Dingle*, 56 Cal.App. 445, 449 [205 P. 705].)

Several cases are relied upon by Mrs. Haeussler for the

proposition that "under the influence of intoxicating liquor" is synonymous with "intoxicated." (*People* v. *Dingle, supra*; *Taylor* v. *Joyce,* 4 Cal.App.2d 612 [41 P.2d 967]; *People* v. *Lewis,* 4 Cal.App.2d Supp. 775 [37 P.2d 752].) She argues that it was error to instruct otherwise.

In the Dingle case, an instruction defining a violation of section 17 of the Motor Vehicle Act (Stats. 1919, p. 214) was challenged because of the asserted failure to define "intoxication." Rejecting that contention, the court said: "The statute does not say that no person shall operate or drive a motor vehicle on the public highway while 'intoxicated,' but that no person shall operate or drive such a vehicle on the public highway while 'under the influence of intoxicating liquor.' The instruction, therefore, very properly does not undertake to define 'intoxication,' but does state what acts and what condition will justify a finding that the accused is 'under the influence of intoxicating liquor,' within the meaning of the statute." (P. 452.)

As a dictum, the court went on to say: "It is probably true, however, that the phrase 'under the influence of intoxicating liquor' is, substantially and to all practical intents and purposes, synonymous with such words as 'intoxication' and 'drunkenness.' But even so, the instruction gives a good definition of 'intoxication.' In *St. Louis etc. Ry. Co.* v. *Waters,* 105 Ark. 619 [152 S.W. 137], the Arkansas supreme court defined intoxication, or drunkenness, substantially in accord with the definition given in this instruction. In that case the court said: 'A man may be said to be drunk whenever he is under the influence of intoxicating liquors to the extent that they affect his acts or conduct so that persons coming in contact with him could readily see and know that the intoxicating liquors were affecting him in that respect'." (P. 452.)

This dictum was the basis for holdings in the Taylor and Lewis cases. Insofar as these decisions hold that a person who is intoxicated also is under the influence of intoxicating liquor they are correct. (*Cf. Tracy* v. *Brecht,* 3 Cal.App.2d 105, 114 [39 P.2d 498].) ▮▮▮ It is generally recognized, however, that persons may be "under the influence of intoxicating liquor" within the meaning of statutes similar to section 501 of the Vehicle Code without being affected to the extent commonly associated with "intoxication" or "drunkenness." (See note 142 A.L.R. 555, 561; consistent with this view are *People* v. *Ekstromer,* 71 Cal.App. 239

[235 P. 69] ; *People* v. *McKee,* 80 Cal. App. 200 [251 P. 675] ; *In re Ryan,* 61 Cal.App.2d 310 [142 P.2d 769].) To the extent that they indicate a contrary holding, *Taylor* v. *Joyce, supra,* and *People* v. *Lewis, supra,* are disapproved.

In another instruction, the jury were charged that Mrs. Haeussler was "under the influence of intoxicating liquor" if, having consumed alcoholic liquor "in any amount whatsoever," she was so affected that she acted "differently from an ordinarily prudent person under similar circumstances." She reads this instruction as permitting the jury to find a violation of the statute as a result of her inability to perform acts other than the safe driving of an automobile. However, the instruction was prefaced with words relating to the driving of a vehicle and preceded by an instruction stating that her ability to operate a vehicle must have been impaired. Read in context, the instruction could not have confused the jury.

Nor is there merit to the contention that the court committed prejudicial error in failing to instruct the jury that Mrs. Haeussler should be acquitted if the accident were unavoidable or if it were found that the accident was caused solely by the negligence of Lovelace. The jurors were told that, to convict Mrs. Haeussler, they must find misconduct by her to have been the cause of death; also, the occurrence of an accident did not warrant an inference of negligence. There was no legal requirement that the court expressly negative liability in the event that either of these contingencies occurred. (*People* v. *Rodgers,* 94 Cal.App.2d 166, 168 [210 P.2d 71].)

The record fails to sustain the charge of bias on the part of the trial judge. The alleged misconduct consists of isolated instances among a great number of procedural rulings, many of which were adverse to the prosecution. No favoritism to either party is shown.

No other assignments of error require discussion.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Traynor, J., and Spence, J., concurred.

CARTER, J.—I dissent.

I cannot agree that the admission of testimony concerning the results of the blood test taken without defendant's consent was not a denial of due process. Defendant was uncon-

scious when the blood sample was taken by the insertion of a hypodermic needle. This necessitated the use of force, however slight, and was an invasion of the privacy of her body. It may be admitted that the force used here was not so brutal or shocking as that used in *People* v. *Rochin,* 101 Cal. App.2d 140, 143 [225 P.2d 1, 913] ; *Rochin* v. *California,* 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396], but it still remains that force was used on the body of a person unable to protect herself, or even to remonstrate against the use of such force.

The illustrations used by the majority to demonstrate that the taking of blood tests, in a medically approved manner, do not ''smack'' of brutality, are not persuasive. First, it is suggested that millions of young men have been subjected to such tests as an incident to induction into military service, that blood tests are required of those applying for a marriage license, of pregnant women during prenatal care, or prior to their delivery. Not one of these groups was accused of a crime—not one of them was composed of unconscious persons. All of them had a choice—that of compliance or refusal. Defendant here had no such choice. A sample of blood was taken from her while in an unconscious state and the results of that test were given in evidence against her. In my opinion, this violates her personal guarantee, not only of due process of law, as guaranteed by both Constitutions, but of the privilege against self-incrimination found in the California Constitution.

Any evidence obtained illegally, and it was certainly as illegally obtained here as if obtained by reason of the search of a person or a home without a search warrant, is in my opinion inadmissible in evidence. I have long been in favor of legislation designed to make such evidence inadmissible in all the courts of this state so that personal privacy may be protected as it was intended to be protected by the Fourth Amendment to the Constitution of the United States and section 19 of article I of the Constitution of California.

In my opinion, the forcible taking of blood for the purpose of making a blood test to use in evidence against that person ''shocks the conscience . . . and is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation.'' (*Rochin* v. *California, supra,* at p. 172.) To take blood from an unconscious person for the purpose of saving that person's life is justified only on the ground of the humanitarian pur-

pose involved; to take it for the purpose of making out a criminal case against that person is something else again. As Mr. Justice Jackson said (*United States* v. *Di Re,* 332 U.S. 581 [68 S.Ct. 222, 92 L.Ed. 210]) our forefathers, "after consulting the lessons of history, designed our Constitution to place obstacles in the way of a too permeating police surveillance, which they seemed to think was a greater danger to a free people than the escape of some criminals from punishment." I agree with this concept and believe that it delineates the line of demarcation between the American way of life and what we are told may be expected under a totalitarian regime.

Because I believe in the dignity and security of the individual and agree with the framers of the Bill of Rights that "the right of the people to be secure in their *persons,* houses, papers, and effects, against unreasonable searches and seizures," should "not be violated," (emphasis added) I cannot sanction the conduct of the prosecution officers in this case, and would, therefore, reverse the judgment.

Schauer, J., concurred.

Appellant's petition for a rehearing was denied July 28, 1953.