[Civ. No. 12934.   First Dist., Div. One.   Apr. 29, 1946.]

THE PEOPLE, Appellant, v. ONE 1941 MERCURY SE-
DAN, ENGINE NO. 302286, Defendant; FRANK WIL-
LIAMS, Respondent.

Robert W. Kenny, Attorney General, and Ralph W. Scott, Deputy Attorney General, for Appellant.

Jos. G. Gallagher and Leo R. Friedman for Respondent.

PETERS, P. J.—This proceeding was instituted by the state pursuant to section 11610 et seq. of the Health and Safety Code to declare a forfeiture of the interests of one Frank Williams, the registered owner, and of the Anglo California National Bank of San Francisco, the legal owner, in a designated automobile, on the ground that such automobile was on April 18, 1944, used unlawfully to conceal, convey, carry or transport marihuana in violation of law. The bank has been paid the balance due on the purchase price of the automobile and has no further legal interest in the proceeding. The trial court excluded most of the evidence offered by the state, and, as a result, found that on the date in question the vehicle was not used in violation of law to conceal, convey, carry or transport narcotics. Judgment was accordingly entered denying forfeiture of the car. From this judgment the state appeals, contending that the rejected evidence was admissible.

The record discloses that on April 18, 1944, an inspector

of the State Division of Narcotic Enforcement followed the Williams car for some distance. He testified that he then knew the car was being used to transport marihuana. The inspector picked up two police officers and then stopped the Williams car then being driven by Williams. Williams got out of the car. The inspector handcuffed one of the passengers and then came over to where the police officers were attempting to search Williams. As he approached, Williams, who had some brown paper in his hands, put the paper in his mouth and tried to pull away from the officers. The inspector asked Williams what he had put in his mouth and was told it was gum. The inspector tried to force Williams' mouth open, and in doing so got his finger between Williams' teeth. Williams bit down on the inspector's finger, and, in the ensuing struggle, Williams succeeded in swallowing what he had in his mouth. One of the officers during the struggle succeeded in handcuffing Williams' hands behind his back.

Williams, still handcuffed, was then put in the inspector's car and taken by the officers to the emergency hospital. He was there placed on an operating table with his hands cuffed in front of him. He was told that the doctor there present was going to pump out his stomach, and, if necessary, they would strap him to the table and use force. Williams stated that would not be necessary. A doctor thereupon forced a tube through Williams' mouth and down his throat and proceeded to pump out the contents of his stomach. Towards the end of this operation Williams began to kick his legs about and the officers then held his legs down on the table.

The substances pumped out of Williams' stomach were placed in jars by the inspector and later delivered by him to another inspector of the State Division of Narcotic Enforcement whose duty it was to make analyses of narcotic drugs. This chemist made an analysis of the contents of the jars and found that they contained marihuana.

The state was permitted to make this preliminary proof, but when the jars were offered in evidence the trial court sustained an objection on the ground that the evidence had been unlawfully secured, and on the further ground that to permit such evidence would be to compel Williams to be a witness against himself in violation of article 1, section 13, of the California Constitution.

The inspector also testified that after Williams had had his stomach pumped out and his handcuffs removed he had

a conversation with Williams in the lobby of the hospital; that in response to questions Williams admitted that on the day in question he had purchased five marihuana cigarettes for an unidentified friend; that he had these cigarettes in his possession when he was stopped by the police; that it was these cigarettes that he had swallowed when the police started to search him.

On this evidence the trial court based its findings and judgment that the state had failed to prove a violation of law sufficient to warrant the forfeiture. The correctness of this judgment admittedly turns upon the correctness of the trial court's ruling excluding the proffered evidence.

Before discussing the basic question involved there are certain preliminary observations that should be made. ▋ In the first place, this is an action equitable in nature *in rem* against the vehicle. (*People* v. *One 1933 Plymouth Sedan,* 13 Cal.2d 565, 569 [90 P.2d 799]; *Traffic Truck Sales Co.* v. *Justice's Court,* 192 Cal. 377, 384 [220 P. 306].) ▋ The purpose of the action is to forfeit the interests of all persons who claim adversely to the state. The legal and registered owners have the statutory right to notice and to contest the validity of the state's claim. ▋ By filing answers such persons voluntarily become parties to the proceeding. (*People* v. *One Ford Coupe,* 10 Cal.App.2d 321 [51 P.2d 882].) The basis of the claimed forfeiture in such cases is the use of the car in violation of the statute. ▋ Such offense likewise is a criminal offense insofar as the persons in the car who are transporting narcotics are concerned. This being so, for the purposes of this appeal, and without now deciding the question, it may be assumed that the same rules apply, so far as the admissibility of the rejected evidence is concerned, as would apply were this a criminal charge against Williams.

In the second place, the question of the legality of the methods used to secure the evidence need not here be discussed. Whether the officers and doctors involved were guilty of an unlawful search and seizure, whether they were guilty of an assault, whether they could be held civilly liable in an action for trespass or for a violation of Williams' right of privacy are matters not involved on this appeal. For the purposes of this appeal it may be assumed, without deciding, that the proffered evidence was secured illegally. ▋ Whatever our views may be as to the propriety of officers of the law using illegal means to enforce the law, the rule is now settled in this

state, contrary to the rule prevailing in the federal courts and in some states, that where competent evidence is produced on the trial the courts will not permit an inquiry into its source or the means by which it was obtained. In other words, illegally obtained evidence is admissible on a criminal charge in this state. (*People* v. *Mayen,* 188 Cal. 237 [205 P. 435, 24 A.L.R. 1383] ; *People* v. *Gonzales,* 20 Cal.2d 165 [124 P.2d 44] ; *People* v. *Kelley,* 22 Cal.2d 169 [137 P.2d 1].) This court is bound by the rule of these cases.

The third factor to be kept in mind is that this is not a proceeding to compel a defendant by court order to submit to a physical examination or to an operation. Of course, if that would constitute an illegal search or seizure no court would or should give a court order to permit an illegal act. Nor in this case are we presented with any question relating to the right of the state to interrogate Williams under section 2055, Code of Civil Procedure, or otherwise. We are here presented with a case where evidence was produced clearly relevant on the issue involved. That evidence in no way depends for its introduction on the credibility or testimony of Williams. It is sought to be introduced through the testimony of the police inspector and doctor who secured that evidence. ██ The problem involved is whether the trial court correctly ruled that the introduction of such evidence would be in violation of article I, section 13, of the state Constitution, which provides in part that: "No person shall be . . . compelled, in any criminal case, to be a witness against himself." The specific question to be decided is whether this section prohibits the introduction of this otherwise competent and relevant testimony.

There is a hopeless conflict on this subject. There appears to be no California case directly in point. Many of the cases that hold that such evidence is not admissible are from states where illegally secured evidence is not admissible. Many courts have confused the two questions and, although they frequently discuss the privilege against self-incrimination, the real basis of their opinions is that illegally secured evidence is not admissible. Other cases that hold that the privilege against self-incrimination would be violated by admitting such evidence involve the question as to whether the prosecution by court order can compel the defendant to undergo tests or operations—an issue outside the scope of this appeal. But even when these classes of cases are excluded there is still a

conflict of authority on the specific question here involved. The solution to the controversy, of course, hinges upon the scope of the privilege against self-incrimination. The question is whether that privilege includes the right of the defendant to exclude evidence gained by physical examinations or tests made upon his body against his will, or whether the privilege is limited to testimonial utterances of the defendant, either written or oral. An examination of the many cases and legal discussions of the problem discloses that the weight of authority, particularly of the more modern cases, is to the effect that the privilege involved only protects a person from any unwilling testimonial disclosures and does not include the right to exclude testimony gained by forced examinations or tests. This conclusion seems inescapable when the history and purpose of the privilege against self-incrimination is considered. (See, for an excellent discussion of the history of the privilege, 8 Wigmore on Evidence (3d ed.) § 2250, p. 276.) After exhaustively discussing the history and background of the privilege Wigmore states (§ 2263, p. 362):

"Looking back at the history of the privilege (*ante*, § 2250) and the spirit of the struggle by which its establishment came about, the object of the protection seems plain. It is the employment of legal process to *extract from the person's own lips* an admission of his guilt, which will thus take the place of other evidence. Such was the process of the ecclesiastical Court, as opposed through two centuries,—the inquisitorial method of putting the accused upon his oath, in order to supply the lack of the required two witnesses. Such was the complaint of Lilburn and his fellow-objectors, that he ought to be convicted by other evidence and not by his own forced confession upon oath. . . .

"In other words, it is not merely any and every compulsion that is the kernel of the privilege, in history and in the constitutional definitions, but *testimonial compulsion*. The one idea is as essential as the other.

"The general principle, therefore, in regard to the form of the protected disclosure, may be said to be this: The privilege protects a person from any disclosure *sought by legal process against him as a witness.*"

In section 2265, page 374, the author reaches the following conclusions on the specific problem here involved:

"If an accused person were to refuse to be removed from the jail to the court-room for trial, claiming that he was

privileged not to expose his features to the witnesses for identification, it is not difficult to conceive the judicial reception which would be given to such a claim. And yet no less a claim is the logical consequence of the argument that has been frequently offered and occasionally sanctioned in applying the privilege to proof of the bodily features of the accused.

"The limit of the privilege is a plain one. From the general principle (*ante*, § 2263) it results that an inspection of the bodily features by the tribunal or by witnesses cannot violate the privilege, because it does not call upon the accused as a witness, *i. e.* upon his testimonial responsibility. That he may in such cases be required sometimes to exercise muscular action—as when he is required to take off his shoes or roll up his sleeve—is immaterial,—unless all bodily action were synonymous with testimonial utterance; for, as already observed (*ante*, § 2263), not compulsion alone is the component idea of the privilege, but testimonial compulsion. What is obtained from the accused by such action is not testimony about his body, but his body itself (*ante*, § 1150). Unless some attempt is made to secure a communication, written or oral, upon which reliance is to be placed as involving his consciousness of the facts and the operations of his mind in expressing it, the demand made upon him is not a testimonial one. Moreover, the main object of the privilege (*ante*, § 2251) is to force prosecuting officers to go out and search and obtain all the extrinsic available evidence of an offense, without relying upon the accused's admissions. Now in the case of the person's body, its marks and traits, itself is the main evidence; there is ordinarily no other or better evidence available for the prosecutor. Hence, the main reason for the privilege loses its force.

"Both principle and practical good sense forbid any larger interpretation of the privilege in this application." (See, also, for an interesting article on the subject, where many cases are collected and the same conclusion reached, 17 Minn. L.Rev. 187.)

The cases are collected and commented upon in 22 Corpus Juris Secundum, page 993, section 649. At page 994 the following conclusions, supported by many cases, are set forth: "While some authorities have extended the privilege against self-incrimination to compelling accused to do any act against his will which results in evidence tending to incriminate him, and accordingly hold that evidence so produced or discovered

is incompetent, the more general view is that the constitutional guaranty renders incompetent only such evidence as is furnished or produced by accused under 'testimonial compulsion,' such as disclosures obtained by legal process against him as a witness, or, as otherwise stated, that it extends only to communications, written or oral, on which reliance is to be placed as involving accused's consciousness of the facts and the operation of his mind in expressing it. The test of admissibility under the majority rule has been said to be whether the proposed evidence depends for its probative force on the testimonial responsibility of accused, or has such force in itself, unaided by any statement of accused."

The overwhelming number of cases hold that the mere fact that the evidence, other than testimonial evidence, had its origin with defendant, even where taken against his will, is no ground for its exclusion. Practically every modern court holds that the accused can be compelled to stand in court for purposes of identification, and that his fingerprints, footprints, photographs and clothing, even where taken against his will, may be admitted, where relevant, without violation of the privilege in question. A few typical cases will suffice to demonstrate the point. In *Holt* v. *United States*, 218 U.S. 245 [31 S.Ct. 2, 54 L.Ed. 1021], a defendant, under duress, was compelled to put on a blouse, and at the trial a witness other than defendant testified that the prisoner put it on and it fitted him. This testimony was objected to upon the ground of the constitutional privilege. The Supreme Court said (p. 252) : "But the prohibition of compelling a man in a criminal court to be a witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material. The objection in principle would forbid a jury to look at a prisoner and compare his features with a photograph in proof. Moreover, we need not consider how far a court would go in compelling a man to exhibit himself. For when he is exhibited, whether voluntarily or by order, and even if the order goes too far, the evidence, if material, is competent."

In *People* v. *Sallow*, 100 Misc. 447 [165 N.Y.S. 915], the defendant contended that by requiring her to have her fingerprints taken, and the receipt in evidence of such fingerprints, she was required, in violation of her constitutional rights to be a witness against herself in a criminal case. The court

said (p. 924 [165 N.Y.S.]): "The taking of finger prints is not a violation of the spirit or purpose of the constitutional inhibition. 'The scope of the privilege, in history and in principle,' says Greenleaf, 'includes only the process of testifying, by word of mouth or in writing; i. e., the process of disclosure by utterance. It has no application to such physical, evidential circumstances as may exist on the witness' body or about his person.' Section 469e, vol. 1, 16th Ed. It would be a forced construction to hold that by finger printing the defendant was required to furnish evidence against herself."

Another interesting case is *State* v. *Barela,* 23 N.M. 395 [168 P. 545, L.R.A. 1918B 844], where the sheriff, against the will of the accused, compelled them to remove their shoes for purposes of comparison with prints found at the scene of the crime. At the trial the sheriff was permitted over objection to testify as to the result of these comparisons. The Supreme Court of New Mexico stated (p. 547 [168 P.]): "The provisions against self-incrimination are limited to testimonial compulsion under process of some kind directed against the defendant as a witness. It does not and cannot logically apply to actions of the defendant under compulsion of persons or officers without judicial sanction. In such cases the physical facts speak, not the defendant as a witness." After referring to a few cases that hold to the contrary the court stated that those cases follow a minority and unsound doctrine. At page 548 it is stated: "They allow the fact that the evidence was illegally obtained to control its admissibility. As before seen, this has nothing to do with the matter. The test is as to whether the evidence is compulsorily given by the defendant under process as a witness. The question as to whether it is the result of an unlawful search or seizure, or whether it is obtained by force or intimidation of private persons or officers, not under sanction of judicial process, ordinarily has no effect whatever upon its admissibility."

In *State* v. *Aspara,* 113 La. 940 [37 So. 883], an exception was taken to the ruling by the trial court in allowing state witnesses to examine certain clothing taken from the defendant after his incarceration, with a view of identifying it as that worn by him at the time of his arrest. One of the grounds of the exception was that it would be equivalent to compelling him to give testimony against himself in a criminal case. The court stated that the objection was properly overruled, and

held that incriminating articles may, if relevant, be used in evidence against the accused, though forcibly, irregularly, or illegally taken out of his possession. In *State* v. *McLaughlin*, 138 La. 958 [70 So. 925], a detective was allowed to testify that on the day of defendant's arrest, which was the date of the homicide, he, with another detective, visited defendant and took certain scrapings from his fingernails; that he placed the scrapings together and turned them over to the assistant chief of detectives. The scrapings were taken in order to ascertain whether they contained human blood. It was shown on the trial that they did. The court on appeal held that the testimony was properly admitted and violated no constitutional right of the defendant.

In *Ross* v. *State*, 204 Ind. 281 [182 N.E. 865], the defendant was accused of robbery. Before trial he was produced before a prospective witness for identification, with a handkerchief over his face and when he had a beard of several hours' growth. The appellant contended that this amounted to a violation of his privilege against self-incrimination. The court held that the rule did not apply to pretrial efforts to identify a suspect as the probable perpetrator of a crime even though those efforts involve physical examination or observation of the suspect against his will. The court, after quoting from *O'Brien* v. *State*, 125 Ind. 38 [25 N.E. 137, 9 L.R.A. 323], stated (p. 869 [182 N.E.]) : "We think that *O'Brien* v. *State* properly limits the privilege against self-incrimination to testimonial compulsion, i. e. a defendant cannot be required to be a witness in his own trial, nor can another person testify under such circumstances that he is a mere 'mouthpiece' of the defendant; the defendant being the 'real witness.' The privilege does not embrace testimony of a witness other than the defendant unless such testimony results in getting before the jury evidence which rests upon the testimonial responsibility of the defendant."

In *People* v. *Jones*, 112 Cal.App. 68 [296 P. 317], the defendant claimed that the evidence of his fingerprints was improperly admitted, being in violation of his privilege against self-incrimination. There was no evidence that the fingerprints were taken by force. The court held the evidence admissible, and, after quoting from the case of *People* v. *Sallow, supra,* stated (p. 72) : "While our attention has been called to no California cases upon this point, the introduction of such evidence is supported, not only by long estab-

lished usage, but, in our opinion, by the better reasoning. As pointed out in the case just referred to, such evidence is not the evidence of the defendant, but is the evidence of a competent witness, and while it is based upon an examination of the defendant, it is no more inadmissible than would be the testimony of one who testified to the existence of a scar.''

Many other cases could be cited to the same effect. There are some cases to the contrary. (See *State* v. *Height,* 117 Iowa 650 [91 N.W. 935, 94 Am.St.Rep. 323, 59 L.R.A. 437]; *State* v. *Newcomb,* 220 Mo. 54 [119 S.W. 405]; *State* v. *Horton,* 247 Mo. 657 [153 S.W. 1051]; *State* v. *Matsinger* (Mo.), 180 S.W. 856; *Bethel* v. *State,* 180 Ark. 290 [21 S.W.2d 176]; *People* v. *Corder,* 244 Mich. 274 [221 N.W. 309].) These cases are far in the minority and have been subjected to criticism. (See 8 Wigmore on Evidence (3d ed.) § 2252, at p. 320, fn. 2.)

Coming now directly to the question of the admissibility of tests or operations made upon the defendant against his will as distinguished from physical identification evidence the majority of cases find no legal distinction between such evidence and the various types of physical identification evidence heretofore discussed. It is true that there are some cases refusing admissibility to evidence, forcefully secured, that the defendant was suffering from a venereal disease, where that evidence is relevant. (See in particular *People* v. *Corder, supra; State* v. *Height, supra.*) But the majority of courts have held that the privilege against self-incrimination is not violated by producing in court through witnesses other than the accused the results of medical examinations, even where done forcefully. A few typical cases will suffice to illustrate the point. In *State* v. *Gatton,* 60 Ohio App. 192 [20 N.E.2d 265], the question arose over the admissibility of evidence as to the refusal of the defendant to submit to a blood test or urinalysis where he had been charged with operating a motor vehicle while intoxicated. The evidence was admitted and he was convicted. On appeal he contended that the admission of such testimony violated the privilege against self-incrimination. In holding that the privilege was limited to disclosure by utterance the court stated (p. 266 [20 N.E.2d]):

''It will be observed in the instant case that the evidence offered was not required to be given by the defendant himself, but was given by the deputy sheriff and the doctor called by the deputy to make the examination of defendant. We are unable to observe any merit in the defendant's claim that the

introduction of such evidence violated his constitutional rights, and we believe, and hold, that the constitutional inhibition against self-crimination relates only, as stated by Greenleaf, to disclosure by utterance. No such disclosure was required of defendant in this case." (See comment on this case 24 Minn.L.Rev. 444.)

The case of *State* v. *Cram,* —— Ore. —— [160 P.2d 283], is one where the defendant was charged with manslaughter committed while under the influence of intoxicating liquor. The accused was rendered unconscious by the accident, and while still unconscious he was arrested and a sample of blood was taken from him for the purpose of having it analyzed to determine its alcoholic content, if any. At his trial the doctor testified as to such content. The court on appeal held the evidence was admissible and stated (p. 289 [160 P.2d]):

"We need not consider how far a court would go in requiring a man to submit to a blood test. See *Holt* v. *United States, supra.* Here the blood has already been extracted; defendant is not being called upon to submit to an examination.

"The defendant was not deprived of any of his constitutional rights by the admission of the testimony here in question. He was not compelled to testify against himself. Evidence of the result of the analysis of the blood sample was not his testimony but that of Dr. Beeman, distinct from anything the defendant may have said or done. The blood sample was obtained without the use of any process against him as a witness. He was not required to establish the authenticity, identity, or origin of the blood; those facts were proved by other witnesses."

In *State* v. *Duguid,* 50 Ariz. 276 [72 P.2d 435], involving the admissibility of a urinalysis, but where there was no compulsion, the court at page 438 [72 P.2d] discussed the problem as follows, quoting from *Lee* v. *State,* 27 Ariz. 52 [229 P. 939] : " '. . . It may be doubted if the constitutional privilege now invoked was ever intended to exempt an accused from an exposition of physical or natural marks or distinctions or characteristics, such as tracks, foot-prints, stains, and finger prints. 4 Wigmore on Evidence, § 2265. The learned author thinks the privilege against self-crimination should be confined to testimonial utterances. As was said in *State* v. *Graham,* 116 La. 779, 41 So. 90:

" ' "The tendency of the more modern case is to restrict the constitutional privilege against compulsory self-crimination

to confessions, and admissions proceeding from the accused, and to open the door to the reception of all kinds of 'real evidence' or proof of physical facts, which speak for themselves.'' ' ''

A case quite similar, factually, to the instant case is *Ash* v. *State*, 139 Tex.Cr.R. 420 [141 S.W.2d 341]. There the accused, who had been charged with receiving stolen property, swallowed several of the stolen rings. He was taken to the hospital and the rings located by fluoroscopic examination. Against his will and over his vigorous objections he was compelled to submit to an enema, and the stolen property thus recovered. This property was identified and produced in evidence at his trial over his objections. He was convicted and appealed, contending the privilege had been violated. The court stated (p. 342 [141 S.W.2d]) : ''It will be noted from the facts of this case that the officers had information pointing to the appellant's guilt; that after he came under their observation they saw him place a metallic object in his mouth which they took to be the rings in question, or one of them. This proved to be correct. His possession of the rings and secreting them in the presence of the officers is the gist of the offense. He was, therefore, committing a felony in their presence. This gave them a legal right to arrest him and search his person. *Hayes* v. *State*, 115 Tex.Cr.R. 644, 28 S.W.2d 556; *Bevins* v. *State*, 110 Tex.Cr.R. 52, 7 S.W.2d 532. Where then should they end this search? If the rings remained in the appellant's mouth, they would have had as much right to search his mouth and secure the rings as if they were in his pocket. He swallowed them. They determined this by seeing him make three or four efforts to swallow something, which took place in their presence and which warranted them in continuing their search. There is no contention that the officers resorted to any cruel or inhuman method of determining the presence of the rings, nor in extracting them. They applied the most approved method of doing so. Under the directions of a skilled operator they located the rings in the appellant's bowels. Could it be said that if a thief has stolen property, sewed it up in his pocket, or in the lining of his coat, that the officers would have no right to cut the stitches or even to injure his clothing for the purpose of securing the valuables belonging to another and that when they did so there would be a question about the admissibility of the evidence thus obtained? The evidence is replete with the conduct of the appellant in fighting the officers

physically resisting every effort made by them to procure the rings, but there is no evidence to indicate any cruelty or unusual treatment on their part in doing so. They gave him an enema, a very normal and natural thing to do, thereby extracting the rings which the appellant had chosen to secrete in this most unusual manner. If the act of the officers should be considered unusual, it was brought about by reason of the act of the accused party. We think that the officers had a legal right to arrest appellant and to search him and to continue that search to such a reasonable degree as to permit them to ascertain whether or not the appellant possessed the stolen property, which they had a right to believe he had.''

The modern and majority rule has been approved by the Model Code of Evidence drafted by the American Law Institute. Rule 205 (p. 136) reads as follows:

''No person has a privilege under Rule 203 to refuse

''(a) To submit his body to examination for the purpose of discovering or recording his corporal features and other identifying characteristics, or his physical or mental condition, or (b) to furnish or to permit the taking of samples of body fluids or substances for analysis.''

The rule is followed by this comment: ''This Rule like Rule 201 adopts the doctrine of the better considered cases that the privilege against self-incrimination applies only to prevent testimonial compulsion and has no application to compulsory exhibition of the body. A number of decisions have held that a compulsory physical examination of a defendant over his protest, for the purpose of determining his physical condition, is a violation of his constitutional right and that evidence discovered by this means is not admissible against him. Some cases dealing with evidence of finger-prints avoid the issue by finding a waiver of privilege by failure to object. The trend is, however, strongly toward the view expressed in the Rule. The legality of the practice of taking Bertillon measurements and finger-prints and other records of identifying characteristics of a person under legal arrest is expounded in *United States* v. *Kelly,* 55 F.2d 67, 83 A.L.R. 122 (C.C.A.2d 1932). The same principle is applicable to Clause (b). This Rule deals only with the privilege against self-incrimination, and leaves entirely open the question whether any other rule of law protects a witness or party against invasion of an asserted right to freedom from interference with his person.''

In line with the weight of authority it is our opinion

that the privilege against self-incrimination does not preclude the introduction of physical disclosures the defendant is forced to make, or the results of tests to which he has involuntarily submitted. It is our view that the privilege only protects the individual from any forced disclosures made by him, whether oral or written. It is limited to the protection against testimonial compulsion. ■ The privilege protects the accused from the process of extracting from his own lips against his will an admission of guilt, but it does not extend to the exclusion of his body as evidence when such evidence may be relevant and material. The privilege is aimed at preventing the compulsory oral examination of the accused before or during trial. Experience of many years has demonstrated that when statements are extorted from an accused there is a strong likelihood that the extorted evidence would be unreliable. But the reason for the rule no longer exists when physical evidence is considered. ■ In the present case the evidence as to the narcotic content of Williams' stomach in no way depended upon the testimonial utterances of Williams for its probative force. Williams was not required to establish the identity, origin, or authenticity of the evidence, nor was he required in any way to testify concerning its analysis. This was done by other witnesses. Under the circumstances, for reasons already stated, the evidence was not privileged and should have been admitted.

Williams contends that whatever the rule may be in other jurisdictions, California has adopted the rule that such evidence, if not voluntarily given, is not admissible. In this connection he cites *People* v. *Guiterez,* 126 Cal.App. 526 [14 P.2d 838], and *People* v. *Salas,* 17 Cal.App.2d 75 [61 P.2d 771]. In the Guiterez case the defendant submitted voluntarily to a physical examination to determine whether he had a venereal disease and such testimony as to the results was held admissible. The same result was reached in the Salas case, where an examination was made of the defendant's forearm without objection, and at his trial it was held that a properly qualified person could testify that the arm showed scars as though made by a hypodermic syringe. The courts there held that results of physical examinations to which the defendants have voluntarily submitted are admissible. It seems to be the thought of Williams that because those two cases emphasized that the physical examinations there involved were voluntary they necessarily implied that the results of an involuntary

examination would not be admissible. This is clearly a *non sequitur*. All that the courts were there concerned with was whether the results of voluntary examinations were admissible. They did not pass upon the question, because it was not involved, whether the results of an involuntary examination are admissible.

The case of *People* v. *Akens*, 25 Cal.App. 373 [143 P. 795], so strongly relied upon by Williams, also is not in point. In that case the defendant was charged with the rape of a female under the age of consent. He was convicted of assault with intent to commit rape. The appellate court reversed the judgment, holding that the verdict was without the scope of the information. At the conclusion of the opinion the following appears (p. 376) : "In the event of a new trial . . . it may be stated that the defendant cannot be required, against his consent, to submit to an examination by a physician. . . ." Apparently, the prosecutor was there attempting to secure a court order to compel such examination. As already pointed out, we are not here called upon to pass upon the legality of the methods used to secure such evidence, nor are we called upon to decide whether a court could or should order such an examination. The question here involved is whether the evidence relating to the narcotic contents of Williams' stomach, already obtained, and assuming, but not deciding, illegally obtained, was admissible. The legality of the methods used to obtain the evidence is not involved on this appeal. So far as the privilege against self-incrimination is concerned, that privilege was improperly invoked in the present case. Other remedies may exist to protect an accused from such acts, but the privilege against self-incrimination is not one of them.

The judgment appealed from is reversed.

Knight, J., and Ward, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied June 27, 1946. Carter, J., and Schauer, J., voted for a hearing.