[L. A. No. 22173. In Bank. Feb. 21, 1952.]

JAMES WILSON NICHOLS, Appellant, v. ROY GILBERT
McCOY, Respondent.

Royal M. Galvin and Daniel Schnabel for Appellant.

Bauder, Gilbert, Thompson, Kelly & Veatch and Henry F. Walker for Respondent.

TRAYNOR, J.—Plaintiff brought this action for the wrongful death of his father, who was struck and killed by defendant's automobile while attempting to cross San Fernando Road on foot. The accident occurred in the early evening at or near a poorly lighted pedestrian crosswalk. There was evidence from which the jury could infer that defendant was negligent in failing to yield the right of way to decedent or in failing to observe him crossing the highway until the moment of impact. There was a conflict in the evidence as to whether or not decedent was in the crosswalk, and the jury could infer that he was negligent in walking or running into the path of defendant's automobile. The jury returned a verdict for defendant upon which judgment was entered, and plaintiff has appealed.

Plaintiff's only contention is that the trial court erred in allowing the head toxicologist of the Los Angeles County coroner's office to testify to the contents of an official record of his office. The record stated that a test made of the blood of decedent indicated the presence of 0.11 per cent alcohol. Plaintiff made no objection in the trial court to the fact that the record was proved by allowing the witness to testify to its contents rather than by introducing the paper itself in evidence, and accordingly, it is now too late to object to the manner in which the evidence of the record was presented. (*Estate of Huston,* 163 Cal. 166, 173 [124 P. 852].) Plaintiff contends, however, that it was prejudicially erroneous to admit the results of the test in evidence, on the ground that there was no proof that the blood tested was that of decedent. (See *People* v. *Smith,* 55 Cal.App. 324, 327 [203 P. 816] ; *American Mut. Liab. Ins. Co.* v. *Industrial Acc. Com.,* 78 Cal.App.2d 493, 496-497 [178 P.2d 40].) Defendant, on the other hand, contends that under sections 1920 and 1953e-1953h of the Code of Civil Procedure, the record of the coroner's office was admissible to prove all the facts stated therein, including the source of the blood, and that in any event there was sufficient additional evidence to prove that the blood referred to in the coroner's record was that of decedent.

Since we have concluded that the challenged record was admissible under the Uniform Business Records as Evidence

Act (Code Civ. Proc., §§ 1953e-1953h), it is unnecessary to decide whether it was also admissible under section 1920 of the Code of Civil Procedure. Section 1953e provides: "The term 'business' as used in this article shall include every kind of business, profession, occupation, calling or operation of institutions, whether carried on for profit or not." Section 1953f provides: "A record of an act, condition or event, shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission." In *McGowan* v. *City of Los Angeles,* 100 Cal.App.2d 386 [223 P.2d 862], it was the opinion of the trial court that the sources of information, method and time of preparation of the record in question were not such as to justify its admission. In that case neither the embalmer nor any other witness from the mortuary testified as to the procedure followed in taking blood samples, and the trial court was therefore justified in concluding that the proper foundation had not been laid. ■ In the present case, however, the trial court concluded that a proper foundation had been laid, and the evidence supports this ruling. There was evidence that as part of the regular operation of the coroner's office, blood samples were collected from undertakers for the purpose of analysis. An analysis was made from a sample taken from a bottle bearing decedent's name. The embalmer testified that he took the sample before embalming the body, labeled the bottle, and left it for an employee of the coroner's office to pick up. He was informed of the name of decedent at the time of the embalming and again the next day when his employer had him sign the embalming certificate. It was not necessary that he have personal knowledge of the identity of decedent. (*Loper* v. *Morrison,* 23 Cal.2d 600, 608-609 [145 P.2d 1].) The trial court was justified in concluding that the embalmer's sources of information with respect to the identity of decedent were accurate and that he would not label a bottle of blood with decedent's name unless he were reasonably sure that it was decedent's. (See Health & Saf. Code, § 10451.) ■ "It is the object of the business records statutes to eliminate the necessity of calling each witness, and to substitute the record of the transaction or

event." (*Loper* v. *Morrison, supra,* 23 Cal.2d 600, 608.) Accordingly, it was unnecessary to call the witness who supplied the embalmer with the information he recorded.

 Aside, however, from the evidence provided by the record itself, there was additional evidence that the blood in the bottle labeled with decedent's name was his blood. Decedent's daughter-in-law testified that his body was taken to the Paschall Mortuary shortly after the accident. The embalmer testified that he took a sample of blood from the only body in the mortuary that night and labeled it with decedent's name. Since decedent's body was in the mortuary, and since there was only one body there, it is clear that the sample of blood taken was that of decedent. It is immaterial, therefore, whether or not the embalmer knew personally the identity of decedent. A sufficient foundation was laid to justify the trial court's conclusion that the blood tested by the coroner's office was decedent's, and accordingly, there was no error in admitting the record in evidence.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., and Spence, J., concurred.

SCHAUER, J., Dissenting.—In matters of legal proof which directly concern security of life, liberty and property I do not like to exchange any portion of certainty, which at best is but relative, for mere convenience, which is unnecessary.

I would prefer that we concern ourselves more with advancing standards of authenticity and reliability of evidence, and enhancing certainty of proof, rather than with developing more convenient substitutes for trustworthy evidence and complacency in lower standards of certainty. The breaking down[1] of the safeguards for reliability of evidence which have been culled from the accumulated experiences of the civilized world in its quest for justice through showing the truth in free courts, does not, in my view, make for the security of

---

[1]This case sets one more flagstone in the path departing from established standards. Illustrative of the trend see *People* v. *Clapp* (1944), 24 Cal.2d 835, 840 [151 P.2d 237]; *People* v. *Wilson* (1944), 25 Cal.2d 341, 351 [153 P.2d 720]; *People* v. *One 1941 Mercury Sedan* (1946), 74 Cal.App.2d 199, 213 [168 P.2d 443]; *People* v. *Rochin* (1950), 101 Cal. App.2d 140, 143, 149 [225 P.2d 1, 913]. But, suggesting a stoppage of the trend in its graver impingements on federal constitutional guaranties, see *Rochin* v. *California* (1952), 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. ——].

a free people. The end, however desirable it might appear in individual cases, does not justify the means.

A sufficient discussion of the reasons for the rule to which I think we should adhere is contained in the opinion authored by Justice Wood (Parker) for the District Court of Appeal, reported at 235 P.2d 412. Upon the grounds stated by Justice Wood, and emphasized by considerations suggested above, I should reverse the judgment.

CARTER, J.—I dissent.

I agree with Mr. Justice Schauer that we should be more concerned with reliable and accurate evidence than with convenient methods of producing it. The holding of the majority that the evidence produced in this case, over plaintiff's objection, was admissible to prove that plaintiff's decedent was guilty of contributory negligence, is one of the most flagrant examples of judicial sanction of nebulous hearsay that has come to my attention.

Mr. Justice Parker Wood's excellent opinion, which I adopt in full as my dissent in this case, points out that no witness who testified had any independent recollection that the official county coroner's record, covering the blood analysis in question, was based. on *the* blood taken from *the decedent.* All witnesses either assumed that it was, thought it must have been, or should have been, or could have been, because that body was the only one in the mortuary at *that* time. Since the witnesses who testified had only a "faint" recollection or no independent recollection of the taking of the blood sample, one is forced to question the statement that decedent's body was the only one there at *that* time. *What* time? As Justice Wood points out, it did not appear that other bodies were not there later that night or at some time during the next two days before the pathologist arrived and performed the autopsy.

While I agree that entries made in the ordinary course of business in the records of business establishments should be admissible in evidence without calling as witnesses the parties making such entries, I can see a vast difference between such records and the one introduced in evidence in the case at bar. The entry in the business record is made at the time the transaction is consummated and, if properly made, discloses the nature of the transaction by indicating what was done and when and how it was done. Such a record, if made in the ordinary course of business, carries a presumption of reg-

ularity and accuracy, while here the possibility of error is so great as to completely destroy its probative value.

I quote with approval the opinion prepared by Mr. Justice Parker Wood, which was concurred in by Presiding Justice Shinn and Associate Justice Vallée, when this case was before the District Court of Appeal, Second District, Division Three, (235 P.2d 412-16) which correctly states the facts and declares the law in accordance with what has been the rule of decision in this state:

"Action for damages for the wrongful death of William Allen Nichols, a pedestrian, resulting from the alleged negligence of defendant in operating an automobile. Plaintiff is the son and only heir of the deceased. In a trial by jury the verdict was for defendant, and the judgment was entered in accordance with the verdict. Plaintiff appeals from the judgment and from the order denying his motion for a new trial.

"Appellant contends that the trial court erred in receiving the testimony of R. J. Abernathy concerning the alcoholic content of a blood specimen. Appellant asserts that the specimen of blood was not properly identified as the blood of the deceased.

"The accident occurred about 7 p. m., on December 25, 1948, on San Fernando Road near the intersection of Arvilla Street which is outside a business or a residential district; San Fernando Road is a paved highway which extends in a northerly and southerly direction; San Fernando Road, at and near the scene of the accident, is approximately 51 feet wide, and has four marked traffic lanes—two for northbound traffic and two for southbound traffic; a pedestrian crosswalk extends across San Fernando Road near and north of that intersection; the crosswalk is 17 feet wide and is marked by white lines about 12 inches wide. There were no traffic control signals at the intersection to regulate traffic on San Fernando Road, and the intersection was 'poorly lighted.'

"On the night of the accident defendant was driving a 1936 Buick automobile in a northerly direction on San Fernando Road. After he had passed the above-mentioned intersection, the automobile he was driving struck Mr. William Allen Nichols, a pedestrian 68 years of age, who was proceeding across San Fernando Road. Mr. Nichols was taken by ambulance to the Van Nuys Receiving Hospital, and he died as a result of being struck by the automobile.

"Defendant testified that he was driving about 30 miles an hour; his automobile was in the lane next to the center

of the highway; traffic proceeding in the opposite direction on the highway was quite heavy and some of the lights were bright; the headlights of his automobile were in good working order and they were burning; he believes he could see clearly for a distance of 50 feet ahead; it was dusk—a time 'when lights didn't show up very good'; he first saw the deceased just before he struck him, at which time deceased was about a foot from his automobile; he (deceased) was moving toward the west; from the glimpse he got of deceased, it appeared that he was running; defendant turned his automobile to the left away from the deceased and applied the brakes, but the right front fender of the automobile struck the deceased; his automobile came to a stop about 35 feet from the point of impact; defendant got out of the automobile and saw the deceased lying on the highway 'towards the back end' of the automobile and about 12 feet east of it; defendant saw the crosswalk before his automobile struck deceased; when his automobile struck deceased, the deceased was about 8 feet north of the north line of the crosswalk; at the time of the accident the deceased was wearing dark clothes. He also testified that the intersection 'wasn't lit up enough so that you could see anything with respect to this crosswalk that is painted across there.'

"A police officer, who investigated the accident, testified that he arrived at the scene of the accident about 7 p. m. and took measurements; the deceased was lying in the 'north-bound curb lane,' 50 feet north of the north line of the crosswalk; there were solid skid marks for a distance of 48 feet, which skid marks extended from a point 3 feet 'within the crosswalk' to the rear wheels of the automobile.

"Plaintiff's wife testified that when she arrived at the scene of the accident the deceased was lying on his side and 'kind of crumpled up,' and his shoes were off; that he was wearing blue and white striped overalls, a khaki shirt and a black hat; his body was removed from the receiving hospital to the Paschall Mortuary.

"Mr. Hilburn testified that he is a licensed embalmer; in December, 1948, he was employed as a contract embalmer by the Paschall Mortuary; he had with him (at the trial) a copy of the Vital Statistics Record; *he faintly recalled doing some work on the body of the deceased*; he took a sample of decedent's blood for chemical analysis, as he was required to do by the coroner's office; it is a routine procedure, and when they take a blood sample they 'put the name of the deceased,

the date, and usually the time that the blood sample was drawn'—the sample is then turned over to the pathologist, or autopsy surgeon. He testified further that his (witness') apprentice was with him when he removed the blood from the body of the deceased; he removed the blood on the night of December 25, 1948, before the body was embalmed; he (witness) put the blood in a bottle; he inquired for the name of the deceased, and he then put his (deceased's) name on the bottle that night by writing it with a pencil on the label which was on the bottle; he left the bottle on a shelf in the preparation room at the mortuary for the pathologist; there was no other bottle there; there was no other body in the mortuary at that time; he had not known the deceased in his lifetime, *but the owner of the mortuary, Mr. Morgan, had told him the body was that of William Nichols; he had no independent recollection that Mr. Morgan had told him the body was that of Mr. William Nichols*; the following day Mr. Morgan presented a certificate to the witness for him to sign as embalmer, and that 'is the case' which he (witness) embalmed; *the night before, Mr. Morgan had not identified anything to him.* He also testified that after embalming is completed, the bottle is placed on the embalming table with the deceased, *but he did not recall doing that in this case; he may have handed the bottle to his apprentice; he did not see the bottle the next day.*

"Dr. Krieger testified that he was the pathologist for the county coroner in December, 1948; on December 27, 1948, he performed an autopsy on the deceased at the mortuary; and that he had notes of the autopsy. He testified further, over the objection of plaintiff, that a sample of the blood of the deceased was turned over to him (witness)—that according to his records he received a blood specimen of the deceased. He testified further that the 'blood samples are placed in a box and picked up by Mr. Dillard' of the coroner's office and taken to the coroner's office for analysis; the bottle in which a sample is contained has the identification of the deceased, and the result of the examination becomes a part of the official public record of the death. *On cross-examination he testified that he had no recollection of this particular autopsy; that he must have picked up a blood sample or he would not have stated 'on the specimen' submitted—'Blood for alcohol'; according to his notes there was a specimen; he (witness) did not make any test of the blood itself, and he took no blood specimen from the body.*

"R. J. Abernathy, called as a witness on behalf of defendant, testified that he is the chemist and head toxicologist for the Coroner of Los Angeles County; he occupied that position in December, 1948; in compliance with a subpoena served on him, he brought the official county records concerning the deceased to court with him; those records are the official records of the coroner's office; the records concerning the chemical work which is done are kept under his direction and supervision. The witness was then asked the following question: 'Now, do you have the records concerning your chemical analysis of the blood test of William Allen Nichols who met his death on Christmas Day in 1948?' He answered, 'I do.' Counsel for plaintiff then said, 'Objected to as a conclusion of the witness, that it was the blood of William Allen Nichols.' The court overruled the objection. The witness was then asked whether, under his supervision, a chemical analysis of the blood of the deceased was made. He replied, 'Yes.' He was then asked if that analysis revealed the content, if any, of alcohol in the deceased's blood stream. He replied, 'It did.' He was then asked what percentage of alcohol was present on examination. He replied, '0.11 per cent.' He testified further that the percentage of ethanol level in the blood required to produce intoxication in the average person is from .10 to .15 per cent.

"There was also testimony by Dr. Krieger that .15 'milligrams per cent' of alcohol in the blood is presumed to be a level at which a great many individuals are considered intoxicated.

"The evidence shows that the analysis of the blood was made under the supervision of the witness Abernathy. *It does not appear that he personally made the analysis or that he was present when it was made. The person who made the analysis under his supervision did not testify and the name of that person was not disclosed.* Mr. Abernathy's testimony as to the alcoholic content of the specimen was based upon a record made in the coroner's office. *The person who allegedly brought the specimen from the Paschall Mortuary to the coroner's office did not testify and his name was not disclosed.* The autopsy was performed at the mortuary two days after the accident occurred. The pathologist, who performed the autopsy, testified that 'blood samples are placed in a box and picked up by Mr. Dillard' and taken to the coroner's office. It seems that said testimony was a statement pertaining to blood samples generally and the customary procedure of the

coroner's office in obtaining the samples, rather than a statement referring particularly to the sample involved herein. Mr. Dillard, referred to in that statement, was in the courtroom but he did not testify. *Although the pathologist also testified on direct examination that a sample of the blood of the deceased was turned over to him, it appears from the cross-examination that he had no recollection of this particular autopsy, that he did not take a specimen from the body of the deceased, and he concluded that he 'must have picked up a blood sample' because, according to his notes, there was a specimen.* The embalmer, who had only a faint recollection of having done some work on the body of deceased, testified as to the 'routine procedure' in taking a blood sample. He also testified that on the night of December 25th, he put the blood in a bottle, inquired for the name of the deceased, put the name of deceased on a label on the bottle, and left the bottle on a shelf in the preparation room for the pathologist; and no other bottle was there. It is to be noted that he also testified that after embalming is completed the bottle containing the sample is placed on the embalming table with the deceased, but he did not recall doing that in this case; that he may have handed the bottle to his apprentice. *It thus appears that he did not remember whether he put the bottle on a shelf or on the embalming table, or whether he handed it to his apprentice. He also testified that no other body was in the mortuary at that time. It does not appear, however, that other bodies were not there later that night or at some time during the next two days which elapsed before the pathologist arrived and performed the autopsy. No bottle or label purporting to be the bottle or label referred to herein was produced in court. There was no evidence as to when or how or by whom the specimen of blood involved here was taken from the mortuary to the coroner's office; and there was no evidence as to the appearance or condition of the bottle or label at the time the specimen was taken from the mortuary or at the time it was received at the coroner's office.* It thus appears that the various steps in the keeping and the transportation of the specimen of Mr. Nichols' blood, from the time the specimen was taken from his body to the time it was analyzed by Mr. Abernathy, were not traced or shown by the evidence. *The blood specimen which was analyzed, and concerning which Mr. Abernathy testified, was not identified as the blood of Mr. Nichols.*

"Respondent asserts that it must be presumed that offi-

cial duty was performed properly and that the public records of the coroner's office are correct. In the case of *McGowan v. City of Los Angeles*, 100 Cal.App.2d 386 [223 P.2d 862, 863], a toxicologist, employed in the coroner's office in charge of the examination of blood of deceased persons, testified that a paper entitled 'Blood alcohol determination' was made by his department in the regular course of business; that the death of Charles Cox was recorded; that the record indicated that the blood that was examined came in a bottle from a certain mortuary; that on the bottle there was the name of Charles Cox and the name of the mortuary; and that the analysis was noted on the paper. An assistant toxicologist, employed in the coroner's office, testified therein that she received the bottle, examined the blood and prepared the said paper. Defendant therein contended that the court erred in refusing to admit the paper in evidence, and relied upon the provisions of section 1920 of the Code of Civil Procedure. Section 1920 provides: 'Entries in public or other official books or records, made in the performance of his duty by a public officer of this state, or by another person in the performance of a duty specially enjoined by law, are prima facie evidence of the facts stated therein.' In that case the court said, 100 Cal.App.2d at page 389, 223 P.2d at page 864: 'If it had been proved that the blood analyzed by the county coroner's office had been taken from the body of Cox before any extraneous matter had been injected into his body, the coroner's record of the analysis would have been admissible and prima facie evidence of the facts therein stated.' It was also said therein, 100 Cal.App.2d at page 390, 223 P.2d at page 864: '. . . the record of the analysis of blood in the present case without tracing the blood to the body of Cox was not admissible.' It was also stated therein, 100 Cal.App.2d at page 392, 223 P.2d at page 866: 'The statute does not change the rules of competency or relevancy with respect to recorded facts. It does not make that proof which is not proof. It merely provides a method of proof of an *admissible* "act, condition or event." . . . In the absence of proof that the blood analyzed was the blood of Cox, taken from his body prior to the injection of any fluid therein, oral testimony of the result of the analysis would not be admissible.' It was also said therein on the same page: 'There was no evidence that any blood was ever taken from the body of Cox, or, if any was taken, the identity of the person who took it, or when it was taken— . . . how, when, and the

identity of the person by whom the container was labeled, or who delivered the bottle to the coroner's office, or that the blood analyzed was that of Cox. Neither the label nor the bottle was identified, offered or received in evidence. No excuse, explanation or justification was given for failure to lay the necessary foundation. The court did not err in refusing to admit the paper in evidence.' In the present case, since the specimen of blood was not identified as the blood of Mr. Nichols, the court erred prejudicially in receiving the testimony as to the analysis of the specimen.''

For the foregoing reasons, I would reverse the judgment.