[Crim. No. 4452.   Second Dist., Div. Three.   Dec. 12, 1950.]

THE PEOPLE, Respondent, v. ANTONIO RICHARD ROCHIN, Appellant.

David C. Marcus for Appellant.

William C. Ring as Amicus Curiae on behalf of Appellant.

Fred N. Howser, Attorney General, and Howard S. Goldin, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—Defendant was charged with violating section 11500 of the Health and Safety Code in that on July 1, 1949, he unlawfully had in his possession a preparation of morphine.  In a trial without a jury he was convicted.  He appeals from the judgment, all orders and rulings of the court.

On July 1, 1949, about 9 a. m., three deputy sheriffs entered defendant's bedroom after having forced the bedroom door open.  They were not authorized by search warrant or at all to enter the room.  Defendant and a Mrs. Hernandez were in the room.  Two capsules, which were wrapped in cellophane, were on a small table therein.  Jack Jones, one of the deputies, said to the defendant, ''Whose stuff is this?''  Defendant then grabbed the capsules and put them in his mouth.  Jones testified that at that moment the three deputies

jumped upon the defendant, grabbed him by the throat, and began to squeeze his throat in an effort to eject the capsules from his mouth; that force was applied to his throat; that defendant "hollered a little bit"; that he (Jones) put his fingers in defendant's mouth; and they put handcuffs on defendant while he was in the room. Jones then took the defendant to the Angelus Emergency Hospital and into the operating room there. A doctor's assistant strapped the handcuffed defendant to the operating table. Dr. Mier, assumed by the officers to be a doctor of medicine, placed an empty pail by the defendant, placed "a tube down the defendant's throat," and released a white chemical solution into the tube and into defendant's stomach. The defendant vomited into the pail, and two capsules in cellophane floated in the pail. Jones took the capsules from the pail and delivered them to a chemist in the sheriff's office. The chemist testified that he examined the two capsules and shook what powdery substance that appeared to be within them into small amounts of chemical reagents that he was using to make the test; that the amount he shook out was very small and was not enough to weigh; that the amount was consumed in the analysis; that the substance which he shook out of the capsules was morphine or one of its close derivatives. The two capsules were shown to the chemist while he was a witness. He testified further that they appeared to be empty; there is a very small amount of very fine powdery residue in one of the capsules; there is a stain or residue of some sort in the other capsule; and the brownish powder in the capsules contains morphine.

Jones testified further that defendant said he had obtained these two capsules of heroin from a person on Sixth Street the night before the arrest, and that he had been using heroin for the past six months.

Defendant did not testify, but it was stipulated that if he were a witness he would testify that the two capsules were taken from him by use of a stomach pump and without his consent and against his will.

Appellant contends that the arrest, search, seizure and examination of defendant violated rights guaranteed to him by Amendments IV and XIV of the Constitution of the United States and by article I, sections 1, 13, and 19 of the Constitution of California, and that the evidence procured thereby was inadmissible; and that the coercive stomach pumping of defendant to obtain evidence against him compelled

him to be a witness against himself in violation of said Amendment XIV and said article I, section 13. He argues that the decision in *People* v. *Mayen,* 188 Cal. 237 [205 P. 435, 24 A.L.R. 1383], which was to the effect that illegally obtained evidence is admissible in a criminal trial in this state, should be overruled; and that the federal rule, which is to the effect that such evidence is not admissible, should prevail in the California courts.

The questions herein, regarding the admissibility in California courts of illegally obtained evidence, have been determined adversely to appellant's contentions. (*People* v. *Gonzales,* 20 Cal.2d 165, 169 [124 P.2d 44]; *People* v. *Kelley,* 22 Cal.2d 169, 173 [137 P.2d 1]; *People* v. *Harmon,* 89 Cal. App.2d 55, 58 [200 P.2d 32]; *People* v. *Garcia,* 97 Cal.App.2d 733, 735 [218 P.2d 837]; *People* v. *One 1941 Mercury Sedan,* 74 Cal.App.2d 199, 202, 203 [168 P.2d 443]; see *People* v. *Raffington,* 98 Cal.App.2d 455, 457 [220 P.2d 967].) In *People* v. *Gonzales, supra,* it was said at page 169: ". . . the accepted rule in this state, as in many others, permits the introduction of improperly obtained evidence on the ground that the illegality of the search and seizure does not affect the admissibility of the evidence." In *People* v. *Kelley, supra,* it was said at page 173: "It was concluded [in the Gonzales case] that the use of evidence obtained through an illegal search and seizure does not violate due process of law because it does not affect the fairness or impartiality of the trial. The fact that an officer acted improperly in securing evidence presented against a defendant does not prevent the court from rendering a fair and impartial judgment." In *People* v. *One 1941 Mercury Sedan, supra,* wherein marihuana was pumped from the stomach of an occupant of the automobile, it was said at pages 202 and 203: "Whatever our views may be as to the propriety of officers of the law using illegal means to enforce the law, the rule is now settled in this state, contrary to the rule prevailing in the federal courts and in some states, that where competent evidence is produced on the trial the courts will not permit an inquiry into its source or the means by which it was obtained. In other words, illegally obtained evidence is admissible on a criminal charge in this state." The contentions of appellant are not sustainable.

Although the statements made hereinabove are sufficient for the decision herein, it should be stated that the rules of

evidence which we are following must not be regarded by police officers and others as a license to indulge in lawless acts. This court does not approve the conduct of Deputy Sheriff Jack Jones and Deputies Smith and Shelton who were with him at defendant's home. Under the record here, they were guilty of unlawfully breaking into and entering defendant's room and were guilty of unlawfully assaulting and battering defendant while in the room. Under the record here, Deputy Jack Jones and the alleged doctor of medicine, Mier, were guilty of unlawfully assaulting, battering, torturing and falsely imprisoning the defendant at the alleged hospital. A remedy of defendant for such highhanded reprehensible conduct is an action for damages. It would appear that the sheriff should review the qualifications of said deputies to be entrusted with the authority of public office. Also it would appear that the qualifications of said Mier as an ethical doctor of medicine should be reviewed.

The judgment, and the order denying defendant's motion for a new trial, are affirmed. The purported appeal from all other orders and rulings of the court is dismissed.

Shinn, P. J., concurred.

VALLÉE, J.—I concur in everything said by Mr. Justice Wood. To me, the record in this case reveals a shocking series of violations of constitutional rights. I am in entire agreement with the views expressed by Mr. Justice Carter in his dissent in *People* v. *Gonzales*, 20 Cal.2d 165, 174 [124 P.2d 44]. However, as a member of an intermediate reviewing court, I am bound by the decisions of the Supreme Court which, unfortunately, have been looked upon by law enforcement officers as an encouragement, if not an invitation, to the commission of such lawless acts. For that reason only, I concur in the judgment.

A petition for a rehearing was denied December 22, 1951, and appellant's petition for a hearing by the Supreme Court was denied January 11, 1951. Carter, J., and Schauer, J., voted for a hearing and then rendered the following opinion.

CARTER, J.—I dissent from the order denying a hearing in this case, and because of the flagrant violation of the fundamental constitutional right of privacy depicted in the opinion of the District Court of Appeal, I cannot refrain from giving

expression to the strong feeling which I have against the holding of this court (*People* v. *Mayen,* 188 Cal. 237 [205 P. 435, 24 A.L.R. 1383]; *People* v. *Gonzales,* 20 Cal.2d 165 [124 P.2d 44]; *People* v. *Kelley,* 22 Cal.2d 169 [137 P.2d 1]) which gives aid and comfort to so-called officers of the law who are so lacking in respect for the constitutional provisions here involved that they ruthlessly violate them with impunity. I commend the justices of the District Court of Appeal for their forthright declarations in this case against the abuses which are permitted and sanctioned by the holding of this court in the cases cited above, and I have little doubt that if the justices of the District Court of Appeal who participated in the decision of this case were members of this court, such holding would be promptly and unmistakably changed, and the above cited decisions of this court supporting such holding would be squarely overruled.

In view of the disinclination of the members of this court to change this obviously erroneous rule—established by its own decisions, and in direct conflict with the decisions of the Supreme Court of the United States and the highest court of many of the other states in the union—(see dissenting opinion in *People* v. *Gonzales, supra,* 20 Cal.2d 165, 176) I am asking the Legislature of California to enact legislation which will force the courts of this state to uphold the constitutional provisions (U. S. Const., 4th Amend.; Cal. Const., art. I, § 19) guaranteeing the right of privacy to residents of this state.

We are told by our national leaders that a state of emergency now exists throughout the world—that our liberties are in jeopardy—that to preserve those liberties we must unite with other free nations of the world in establishing the most potent military force of all time to resist totalitarian aggression. What are these liberties which are threatened? Is not the right of privacy, guaranteed by the above mentioned constitutional provisions, one of those liberties? There can be no question that the right of privacy is one of these fundamental rights, guaranteed by the Bill of Rights—the charter of our civil liberties. Could anyone imagine such right being any more ruthlessly violated under a totalitarian regime than it was in the case at bar? It makes little difference whether the minion of the law who perpetrates such outrages has the official title of commissar, gestapo, sheriff, policeman, constable, game warden, or whatnot, the violation of one's right of privacy is just as deplorable. Merely to say that what the

officers did in this case, was wrong, is not enough—they will do it again and again if the courts continue to hold that the evidence they obtain by such unlawful means may be used in criminal prosecutions. The Legislature must therefore declare by statute that evidence obtained in violation of the constitutional provisions here involved shall be inadmissible in any judicial proceeding in order to protect the right of privacy guaranteed by our Constitution so long as this court persists in perpetuating the error it committed in its decision in the Mayen case.

The forefathers of this country and the framers of the Constitution of the United States were of the firm conviction that the maxim of Lord Coke was not only true, but that it would be true in the years to come, and that a provision to insure its protection should be placed in the Bill of Rights. Lord Coke said that ''The house of everyone is to him as his castle and fortress, as well for his defense against injury and violence as for his repose.''

This great right is expressed in the Fourth Amendment to the Constitution of the United States, and it reads as follows: ''The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'' This exact provision is found in the Constitution of our state in section 19, article I.

The United States Supreme Court, speaking through many great judges and in a great number of cases, has staunchly refused to allow this right to be violated. In the highest court of our country, the protection extends even farther than the literal words of the amendment. No evidence obtained in violation thereof may be used against a defendant in the federal courts. This is the result I desire to achieve by the proposed legislation. Such a statute should provide: *''No evidence obtained in violation of Section 19, Article I of the Constitution or any law of the State of California shall ever be introduced or admitted or used for any purpose whatsoever in any Court of this State.''*

Mr. Justice Holmes, in his great dissent in *Olmstead* v. *United States*, 277 U.S. 438 (469, 479) [48 S.Ct. 564, 72 L.Ed. 944] had this to say: ''But I think, as Mr. Justice Brandeis says, that apart from the Constitution the government ought not to use evidence obtained and only obtainable by a criminal

act . . . we must consider the two objects of desire, both of which we cannot have and make up our minds which to choose. It is desirable that criminals should be detected, and to that end that all available evidence should be used. It also is desirable that the government should not itself foster and pay for other crimes, when they are the means by which the evidence is to be obtained. If it pays its officers for having got evidence by crime I do not see why it may not as well pay them for getting it in the same way, and I can attach no importance to protestations of disapproval if it knowingly accepts and pays and announces that in future it will pay for the fruits. We have to choose, and for my part I think it a less evil that some criminals should escape than that the government should play an ignoble part.''

The problem to be solved is a serious one. Under the law of this state any police officer may break into any home, seize anything he may desire and this may be used against a defendant despite the fact that no warrant had been issued, and that the breaking and entering may have been done on mere suspicion or conjecture. The constitutional provision was adopted to prevent this very evil. Mr. Justice Douglas, in a recent decision handed down by the Supreme Court of the United States (*McDonald* v. *United States*, 335 U.S. 451 [69 S.Ct. 191, 93 L.Ed. 153]) stated the proposition well when he said: ''We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade, that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing; and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. *We cannot be true to that constitutional requirement* and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative.'' The same statement is no less true when it is said of our Constitution. Power is a heady thing whether it is exercised by federal police or by state police, and history does show

that the police, no matter whether of our government or of the federal government, when acting on their own cannot be trusted.

The contention is frequently made, in support of the law as it now stands, that the officers found what they expected to find and that therefore the evidence must be admissible. Mr. Justice Jackson in *United States* v. *Di Re,* 332 U.S. 581 [68 S.Ct. 222, 92 L.Ed. 210] answers it in this way: "The Government's last resort in support of the arrest is to reason from the fruits of the search to the conclusion that the officers' knowledge at the time gave them grounds for it. We have had frequent occasion to point out that a search is not to be made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success.

"We meet in this case, as in many, the appeal to necessity. It is said that if such arrests and searches cannot be made, law enforcement will be more difficult and uncertain. But the forefathers, after consulting the lessons of history, designed our Constitution to place obstacles in the way of a too permeating police surveillance, which they seemed to think was a greater danger to a free people than the escape of some criminals from punishment."

The right of the people to be secure in their persons, houses, papers and effects must be protected. In the understandable zeal of police officers to ferret out crime and in the excitement of the capture of a suspected person, officers are less likely to possess the detachment and neutrality with which the constitutional rights of the suspect must be viewed. To provide the necessary security against unreasonable intrusions upon the private lives of individuals, the framers of the Fourth Amendment required adherence to judical processes wherever possible. And subsequent history has confirmed the wisdom of that requirement. This should also be true of our constitutional provision, but it has not been so construed to prevent evidence so obtained from being used against the accused person.

The elder Pitt, in his speech on the Excise Tax, gave expression to what later became the Fourth Amendment. What he said then is just as important today. He said that "The poorest man may in his cottage bid defiance to all the forces of the crown. It may be frail; its roof may shake; the winds may blow through it; the storms may enter; the rain may enter—but the King of England cannot enter. All his forces cannot cross the threshold of the ruined tenement." Yet the

police and other so-called law enforcement officers in California may now ruthlessly force their way into the home of a private citizen, and *without a search warrant,* seize whatever they may find and use it as evidence in our courts notwithstanding they violated the constitutional right—the right of privacy—of the citizen in obtaining it. Cases such as this make it crystal clear that a rigid application of the federal rule is necessary to prevent this abuse of police power. It has been truly said that: "Power is a bell which prevents those who start it ringing from hearing any other sound."

Every student of history recognizes that the abuse of official power has been the source of the major ills inflicted upon mankind since the existence of organized governments. This is true notwithstanding the effort of those who believe in a democratic form of government to establish a system of checks and balances so that boundless power is not reposed in any single official or branch of government. Hence the provision of both the Fourth Amendment to the Constitution of the United States and section 19 of article I of the Constitution of California that before a search may be made or evidence seized, proof under oath must be submitted to a magistrate— a judicial official—that probable cause exists for such search or seizure, and a warrant issued by such magistrate "particularly describing the place to be searched and the person or thing to be seized." Those constitutional mandates were designed to place a curb or restriction upon the power of the law enforcing branch of the government, requiring it to obtain judical sanction, in cases where a search is necessary to obtain such evidence. It is sheer nonsense to say that those who drafted those constitutional provisions ever had any other thought in mind than that evidence obtained in violation thereof would not be accepted by any court or accorded judicial sanction. As Mr. Justice Douglas so aptly stated in the McDonald case, *supra,* "*We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative.*"

I agree with Mr. Justice Douglas, and it must follow, that every law enforcing officer, every prosecuting attorney, every judge and justice of any court of this state who has taken a solemn oath to support the Constitution of the United States and the Constitution of the State of California, and gives his sanction to the use of evidence obtained in violation of the

constitutional provisions here involved, makes of that oath, insofar as it applies to these constitutional provisions—which he has solemnly sworn to support—an empty hollow mockery.

I would grant the petition for hearing in this case, and reverse the judgment with direction to the trial court to dismiss the charge against the defendant.

Schauer, J., concurred.

SCHAUER, J.—I dissent from the order denying the petition for hearing. In my opinion a conviction which rests upon evidence of incriminating objects obtained from the body of the accused by physical abuse is as invalid as a conviction which rests upon a verbal confession extracted from him by such abuse.

"To extort testimony from a defendant by physical torture in the very presence of the trial tribunal is not due process. The case stands no better if torture induces an extrajudicial confession which is used as evidence in the courtroom.

"A trial dominated by mob violence in the courtroom is not such as due process demands. The case can stand no better if mob violence anterior to the trial is the inducing cause of the defendant's alleged confession.

"If, by fraud, collusion, trickery, and subornation of perjury, on the part of those representing the state, the trial of an accused person results in his conviction, he has been denied due process of law. The case can stand no better if, by the same devices, a confession is procured, and used in the trial.

"The concept of due process would void a trial in which, by threats or promises in the presence of court and jury, a defendant was induced to testify against himself. The case can stand no better if, by resort to the same means, the defendant is induced to confess and his confession is given in evidence." (*Lisenba* v. *California* (1941), 314 U.S. 219, 237 [62 S.Ct. 280, 86 L.Ed. 166].)

In *People* v. *One 1941 Mercury Sedan* (1946), 74 Cal.App. 2d 199, 213 [168 P.2d 443], where law enforcement officials assaulted and battered accused, compelling him to vomit an incriminatory substance, the court said that the privilege against self-incrimination "protects the accused from the process of extracting from his own lips against his will an admission of guilt, but it does not extend to the exclusion of his body as evidence when such evidence may be relevent and material. The privilege is aimed at preventing the compul-

sory oral examination of the accused before or during trial. Experience of many years has demonstrated that when statements are extorted from an accused there is a strong likelihood that the extorted evidence would be unreliable. But the reason for the rule no longer exists when physical evidence is considered.'' This reasoning appears to ignore a problem more basic and more important in legal concept than the question of the actual guilt or innocence of the accused. We are not concerned here merely with a rule designed to exclude untrustworthy evidence; we are, or should be, as in the situations described in the above quotation from the Lisenba case, concerned with the fundamental concept of due process. The requirements of due process are just as applicable to the guilty as to the innocent.

The privilege against self-incrimination protects a guilty person from being required, by orderly process, to answer questions on the ground that such answers might furnish ''a link in the chain of evidence needed in a prosecution.'' (*Blau* v. *United States* (1950), 340 U.S. 159 [71 S.Ct. 223, 95 L.Ed. ——], 19 L.W. 4062.) The person who claims this privilege before a grand jury or a court has the opportunity to establish his right to remain silent by litigation. The defendant here had no such opportunity, Without a warrant the officers broke into his room; they assaulted and battered defendant and took him away by force; by further force he was compelled to vomit and thus to produce evidence against himself. Had the evidence forced from defendant's lips consisted of an oral confession that he illegally possessed a drug, then, even though the sheriffs by physical violence had deprived him of his privilege against self-incrimination, he would have the protection of the rule of law which excludes coerced confessions from evidence. But because the evidence forced from his lips consisted of real objects the People of this state are permitted to base a conviction upon it. I find no valid ground of distinction between a verbal confession extracted by physical abuse and a confession wrested from defendant's body by physical abuse.

Carter, J., concurred.