BISHOP, J.
The proceedings in each of these cases ran the same course. Each defendant was charged with having failed to register as a member of a communist organization, as required by county ordinance number 5578. A demurrer was filed to each complaint and sustained on the ground that the provisions of the ordinance, alleged to have been disobeyed, were without force because of constitutional restrictions. From the judgment of dismissal that followed in each case, the People have appealed. We have reached the conclusion that the ordinance violates the principle written into the Bill of Rights of the federal Constitution (Amendment V), which “is found in the constitution of every state in the country” (Ex parte Cohen (1894), 104 Cal. 524, 527 [38 P. 364, 365, 43 Am.St.Rep. 127, 26 L.R.A. 423]), and which is given this expression in section 13, article I, of our state Constitution: “No person shall ... be compelled, in any criminal case, to be a witness against himself. ’ ’ It inevitably follows that we find the ordinance to be without validity and, as a consequence, hold that the dismissals of the complaints based upon it were proper.
We referred to the Fifth Amendment to the federal Constitution. That amendment has not yet been incorporated into the Fourteenth Amendment, so it does not affect the ordinance in question (Adamson v. California (1946), 332 U.S. 46, 51-55 [67 S.Ct. 1672, 91 L.Ed. 1903, 1908-1910, 171 A.L.R. 1223]) any more than do the like provisions in the constitutions of our sister states. The widespread appearance of the prohibition against self-incrimination was noted to indicate that it is a thoroughly settled policy in the American system of justice, and that we may look to the interpretation given in federal and other cases as an aid to an understanding of the words quoted from our Constitution.
At first glance, the provision in question does not appear to touch the situation covered by the ordinance. The ordinance—we shall look into some of its terms more clearly a bit later—only requires those covered by its provisions to register with the sheriff. It does not purport to compel anyone to be a witness in a criminal case, nor does it deal with people who are witnesses in criminal cases. Such observations, however, miss the point of the provision entirely. *957 The words, “No person shall ... be compelled, in any criminal case, to be a witness against himself” mean that no person shall be compelled to make any statement, orally or in writing, anywhere or at any time, which may be made use of against him in any criminal prosecution, then pending or which might thereafter be brought against him. With almost complete unanimity the eases find in the words more than is literally there. The protection afforded includes but goes beyond the assurance to a defendant on trial in a criminal ease that he will not be compelled to testify against himself. The protection intended applies even before the commencement of a criminal case and secures one who may reasonably be expected to be a defendant from furnishing ammunition to be used against him.
It is important that the meaning of the provision we are considering be correctly understood, for we know that we should not lightly agree that the county ordinance is invalid; we must be sure of our ground before we declare that the attempt it makes to contribute to the solution of a difficult problem is a futile gesture. We find the meaning of the provision made clear in many cases. In Ex parte Clarke (1894), 103 Cal. 352 [37 P. 230], the petitioner had been imprisoned because he refused to answer questions put to him in a proceeding initiated by his assignee in insolvency, the object of which inquiry was to ascertain whether or not the petitioner had concealed assets which he should have turned over to the assignee. Had he concealed any of such assets he would have violated section 154, Penal Code, and so been guilty of a high-grade misdemeanor. Viewing petitioner’s plight, our Supreme Court stated in an opinion written by Chief Justice Beatty (103 Cal. 354-5 [37 P. 231]): “No person can be compelled in any criminal case to be a witness against himself. (Const., art. I, § 13.)
“To bring a person within the immunity of this provision, it is not necessary that the examination should be attempted in a criminal prosecution against the witness, or that such a prosecution should have been commenced and actually pending. It is sufficient if there is a law creating the offense under which the witness may be prosecuted. If there is such a law under which the witness may be indicted or otherwise prosecuted for a public offense arising out of the acts to which the examination relates, he cannot be compelled to answer in any collateral proceeding unless the law absolutely secures him against any use in a criminal prosecution of the evidence *958 he may give; and this can only be done by a provision that, if he submits to the examination and answers the questions, he shall be exempt from any criminal prosecution for the offense to which the inquiry relates.
“All these propositions are decided by the supreme court of the United States upon an exhaustive review of the authorities in the case in Counselman v. Hitchcock, 142 U.S. 547 [12 S.Ct. 195, 35 L.Ed. 1110], a case in every essential particular identical with this."
A like meaning is given to the protecting words of the Constitution in Ex parte Cohen, supra (1894), 104 Cal. 524 [38 P. 364, 43 Am.St.Rep. 127, 26 L.R.A. 423], The petitioner had been imprisoned until he would answer questions asked him during an examination concerning another person, held before a committing magistrate. We find this discussion in the opinion illuminating (104 Cal. 527-8, 38 P. 365) : “The provision that a person shall not be compelled ‘in a criminal case’ to be a witness ‘against himself’ is to be construed as protecting him from being compelled to give any evidence which in a criminal prosecution against himself might in any degree tend to establish the offense with which he may be charged. It is only when his evidence may tend to establish an offense for which he may be punished under the laws of the state that he is a witness ‘against himself’ in a criminal case. The ‘criminal case’ in which he is a witness need not be against himself, but his immunity from compulsion extends to all evidence which may be used in any criminal case against himself, under whatever circumstances such evidence may be sought ...” The circumstance that the court thereafter determined that no answer to the questions asked of the petitioner could tend to incriminate him, because of statutory immunity, does not detract from the force of the words quoted.
In Ex parte Tahbel (1920), 46 Cal.App. 755 [189 P. 804], the petitioner sought his 15-year-old son’s release from detention in Juvenile Hall, where he was confined because he would not answer some questions which were pertinent to a petition that he be declared to be a ward of the juvenile court for having committed perjury. In support of its conclusion that the detention was illegal, the District Court of Appeal (Finlayson, P. J., writing the opinion) stated (46 Cal.App. 758-759,189 P. 806) : “According to one of the oldest maxims of the common law, nemo tenetur se ipsum acensare, any person, whether a party or stranger to the litigation, either in a *959 civil action or a criminal prosecution, may, if he sees fit, refuse to answer any question the answer to which, if true, will render him punishable for crime, or which, in any degree, may tend to establish a public offense with which he might be charged. (Rapalje on Witnesses, sec. 261.) This principle of the common law doubtless had its birth in the abhorrence with which confessions coerced by inquisitorial torture were regarded alike in England and America. (8 R.C.L., p. 78.) Its soundness has seldom been questioned. And today it stands among the guaranties of personal liberty and security in all the constitutions, both of England and America.” We add, that there is nothing in the many trials reported from behind the iron curtain, with their inevitable confessions, that tempts us to whittle away at this principle established in our judicial system.
In re Lemon (1936), 15 Cal.App.2d 82 [59 P.2d 213], and Ex parte Gritchlow (1938), 11 Cal.2d 751 [81 P.2d 966], do not cast much new light upon our problem, but they serve to indicate that the light of the earlier cases remains undimmed.
The predicament of three more persons who found themselves jailed because of their refusal to answer questions gave rise to three opinions in which it was held that the protection of section 13, article I, is not limited to cases where the declaration demanded would amount to an involuntary confession of the crime itself, but is so broad that one is not required to reveal any detail that might assist in convicting him of a crime. In Ex parte Berman (1930), 105 Cal.App. 37, 44-45 [287 P. 126, 128], the court made a quite extensive quotation from an opinion of Chief Justice Marshall, given in the case of United States v. Burr (In re Willie), 25 Fed. Cas. p. 38, of which it said: “That this concise yet comprehensive statement of the celebrated chief justice remains the law to-day is evident from the fact that almost every case throughout the United States, down to and including Mason v. United States, 244 U.S. 362 [61 L.Ed. 1198, 37 S.Ct. 621], has quoted it with approval.” We limit our requotation to these words: “ ‘ The counsel for the United States have also laid down this rule according to their understanding of it; but they appear to the court to have made it as much too narrow as the counsel for the witness have made it too broad. According to their statement a witness can never refuse to answer any question unless that answer, unconnected with other testimony, would be sufficient to convict him of a crime. This would be rendering the rule almost perfectly worthless. *960 Many links frequently compose that chain of testimony which is necessary to convict any individual of a crime. It appears to the court to be the true sense of the rule that no witness is compellable to furnish any one of them against himself. It is certainly not only a possible but a probable case that a witness, by disclosing a single fact, may complete the testimony against himself, and to every effectual purpose accuse himself as entirely as he would by stating every circumstance which would be required for his conviction. That fact of itself might be unavailing, but all other facts without it would be insufficient. While that remains concealed within his own bosom he is safe; but draw it from thence, and he is exposed to a prosecution. The rule which declares that no man is compellable to accuse himself would most obviously be infringed by compelling a witness to disclose a fact of this description. ’ ”
That one cannot be required to speak if by so doing he might furnish a link in the chain by which a conviction might hang, is held also in Ex parte Crow (1932), 126 Cal.App. 617 [14 P.2d 918, 919], and in Ex parte Sales (1933), 134 Cal. App. 54, 59 [24 P.2d 916, 918]. We add this quotation from Doyle v. Hofstader (1931), 257 N.Y. 244 [177 N.E. 489, 87 A.L.R 418, 421], where Chief Judge Cardozo was speaking of the provision in the Constitution of New York that no person shall “be compelled in any criminal case to be a witness against himself”: “The privilege may not be violated because in a particular ease its restraints are inconvenient or because the supposed malefactor may be a subject of public execration or because the disclosure of his wrongdoing will promote the public weal.
“It is a barrier interposed between the individual and the power of the government, a barrier interposed by the sovereign people of the state; and neither legislators nor judges are free to overleap it.
“The appellant is therefore privileged to refuse to answer questions that may tend to implicate him in a crime, unless by some act of amnesty or indemnity, or some valid resolution equivalent thereto, he has been relieved from the risk of prosecution for any felony or misdemeanor that his testimony may reveal. The immunity is not adequate if it does no more than assure him that the testimony coming from his lips will not be read in evidence against him upon a criminal prosecution. The clues thereby developed may still supply the links whereby a chain of guilt can be forged from the testimony of others. *961 To force disclosure from unwilling lips, the immunity must be so broad that the risk of prosecution is ended altogether.”
Turning now to the ordinance, we find it begins with this unequivocal statement: “There exists a world-wide revolutionary movement whose purpose it is, by any means deemed necessary, to establish and perpetuate a totalitarian communist dictatorship based upon force and power, rather than upon law, in all of the countries of the world, including the United States, even though it be against the consent of the majority of the people of such countries.” Then follows in too many words to quote, not a definition, but a characterization of this worldwide revolutionary movement. It aims to put into effect the basic precepts of communism (the ordinance states) expounded by Karl Marx and a number of others, as they have been and are being interpreted and executed by the Soviet Union. It has supplanted constitutional governments with communist dictatorship, against the will of the people whose governments were overthrown. It achieves its goals by terrorism, sabotage and organized confusion. “In Los Angeles County,” the ordinance continues, “there are active, disciplined communist organizations presently functioning for the primary purpose of advancing the objectives of the world communism movement . . . notwithstanding the refusal of the majority to accept such principles and doctrines through the free exercise of the ballot or by any other lawful or constitutional means.” More of like tenor appears.
As a conclusion following the recital of these facts, the ordinance does not put the finger upon any individual or group of individuals and declare: “We have been talking about you, and this is what shall be done as a consequence,” as the legislation which was condemned in Communist Party v. Peek (1942), 20 Cal.2d 536 [127 P.2d 889], attempted to do. Instead, it defines “communist organization” as meaning “any organization which is organized, or which operates, primarily for the purpose of advancing the objectives of the world communism movement,” and requires, under a possible penalty of a $500 fine and six months’ imprisonment for disobedience, that “every person who resides in, is employed in, has a regular place of business in, or who regularly enters or travels through any part of the unincorporated territory of Los Angeles County, and who is a member of any communist organization, shall register by acknowledging under oath and filing with the Sheriff’s Department of the County *962 a registration statement containing the following (1) Name and any alias or aliases of the registrant ... (4) the name of all communist organizations of which he is a member.” This leaves these facts, at least, to be proven in any prosecution under the ordinance: (a) the existence of an organization, (b) its character as a “communist organization,” (e) membership of the defendant in it, and (d) that the defendant resides, or whatever, in some unincorporated area in Los Angeles County.
Succinctly stated, but unmistakably clear, that which the ordinance requires, under penal sanctions, is that any person (residing or etc.) who belongs to an organization that proposes to substitute the economic system known as communism for our present system of industrial ownership and control, and to overthrow our present form of government and replace it with a dictatorship, and which proposes to accomplish these purposes not by constitutional means but by terrorism and sabotage, must file an affidavit with the sheriff, giving his name and the name of the organization that holds these purposes. But—compliance with the ordinance would amount to a virtual confession that the registrant had violated the so-called Criminal Syndicalism Act (Stats. 1919, p. 281, 3 Deering’s Gen. Laws, Act 8428). The act is a short one and we quote only a part: Section 1. ‘ ‘ The term ‘ criminal syndicalism’ as used in this act is hereby defined as any doctrine or precept advocating, teaching or aiding and abetting the commission of crime, sabotage (which word is hereby defined as meaning willful and malicious physical damage or injury to physical property), or unlawful acts of force and violence or unlawful methods of terrorism as a means of accomplishing a change in industrial ownership or control, or effecting any political change.” Section 2. “Any person who ... 4. Organizes or assists in organizing, or is or knowingly becomes a member of, any organization, society, group or assemblage of persons organized or assembled to advocate, teach or aid and abet criminal syndicalism ... Is guilty of a felony.” The constitutionality of this subdivision 4 of section 2 was upheld in People v. Steelik (1921), 187 Cal. 361 [203 P. 78], and again in Whitney v. California (1926), 274 U.S. 357 [47 S.Ct. 641, 71 L.Ed. 1095],
In view of the facts found in the ordinance (and we, with our judicial knowledge of current events, shall not undertake to contradict any of them), it is not at all fanciful that any member of a communist organization, as defined by the *963 ordinance, may find himself under indictment for violating subdivision 4, section 2 of the Criminal Syndicalism Act. The one fact essential to the successful proof of his guilt may well be the fact of his membership in an organization whose illegal activities are known. In such event, the defendant’s registration would serve to furnish an important link in the prosecution. Perhaps the activities of the defendant will be known, but the identity of the group with whom he has conspired will be the missing link. It may be that the facts establishing the venue will be those the prosecution needs. We can see an advantage to the prosecution in having the defendant’s registration, but it is denied that advantage by the long established, constitutionally expressed, prohibition against compelling an individual to bear witness against himself. Because that would be the effect of the ordinance, it has no effect.
Several of the arguments put forward in defense of the ordinance against the attack upon it which we have been considering, merit mention here. We are sympathetic to the argument that, generally speaking, the constitutionality of an ordinance can be more fairly determined after the facts of the ease have been developed at a trial, by which time the question becomes more concrete and less abstract than appears upon a demurrer. By way of pressing home the point, amici curiae rely upon the rule stated in Rebstoek v. Superior Court (1905), 146 Cal. 308, 313 [80 P. 65]: “. . . a witness is not exempted under the constitutional provision . . . from testifying concerning any offense which is, as to him, barred by the statute of limitations,” and suggest that the bar of the statute might remove the possibility of self-incrimination from the defendants here. That suggestion would be worthy of consideration if the criminal prosecutions that the defendants possibly face were for acts committed some time ago. As we have seen, however, the ordinance requires only one presently a member of a communist organization to register, and so the felony that such membership is declared to be by the Criminal Syndicalism Act does not outlaw for three years (Pen. Code, § 800). Under the situation as presented in these cases, where the danger of self-incrimination appears on the mere reading of the ordinance, the constitutionality of the ordinance is fairly at issue, and must be determined, under the attack of a demurrer.
Nor is the ordinance a simple police power regulation requiring the identification of citizens. The requirement of *964 section 482, Vehicle Code, that the driver of a vehicle involved in an accident shall give his name, address and the registration number of his vehicle, does not necessarily implicate the driver in the commission of a crime, for an accident is not a crime, per se. The constitutionality of this and similar statutes is approved in People v. Diller (1914), 24 Cal.App. 799 [142 P. 797], The ordinance we are considering does not come into operation, however, until a violation of the Criminal Syndicalism Act has occurred, and only one who is violating that act is compelled to register and by registering furnish, quite likely, some of the clews needed to establish his guilt. No such statute as this is looked upon with favor in the Diller case.
As we have already discovered, it has repeatedly been held that unless complete immunity from prosecution as to the crime “confessed” is given, one cannot be compelled to be a witness against himself. The provision of section 7 of the ordinance to the effect that the registration statements shall not be available for public examination does not attempt to grant such immunity, nor does it have any such effect. We doubt seriously—we need not determine the matter—that any provision of a county ordinance could have the effect of limiting the receipt of what would otherwise be competent evidence in a criminal prosecution. We are sure that no county ordinance can validly provide that any act shall confer immunity from prosecution for committing an act declared to be a crime by the Legislature. Such an ordinance would unquestionably be “in conflict with general law,” and so fall within the limitations of section 11, article XI, state Constitution. But be that as it may, the ordinance under review cannot be interpreted as even attempting to grant immunity, nor as giving it.
A further argument along the same line is that inasmuch as the registration is compulsory, it would not be received in evidence against the registrant. This is true, of course, of confessions involuntarily given, but it is not necessarily true of such admissions against interest as the registration affidavits would be. Note the uncertain rule of the decisions with respect to the necessity of the voluntary character of admissions, not amounting to confessions, in order that they may be received in evidence: 8 Cal.Jur. 99-100; People v. Shannon. (1928), 203 Cal. 139, 143 [263 P. 522]; People v. Nagle (1944), 25 Cal.2d 216, 222-223 [153 P.2d 344]; People v. *965 Eggers (1946), 30 Cal.2d 676, 689 [185 P.2d 1]; People v. Trawick (1947), 78 Cal.App.2d 604, 608 [178 P.2d 45]; People v. Ramsey (1948), 83 Cal.App.2d 707, 721 [189 P.2d 802]. We have in mind also that the constitutional protection against unreasonable searches and seizures, contained in section 19 of article I of the state Constitution, the philosophy of which is quite like that against self-incrimination (see Feldman v. United States (1943), 322 U.S. 487, 489, 490 [64 S.Ct. 1082, 88 L.Ed. 1408, 1412, 1413, 154 A.L.R 982]) does not serve to keep any article found in an unlawful search from being used in evidence in the state courts. (People v. Rochin (1950), 101 Cal.App.2d 140, 141 [225 P.2d 1, 2, 913], and cases cited, including People v. Gonzales (1942), 20 Cal.2d 165, 169 [124 P.2d 44, 46].) But we need not anticipate, or await, an authoritative ruling on the admissibility in evidence of a compulsory registration that could aid in the prosecution of the registrant. All we need note is that if the contention is sound, statements made under compulsion thereby are robbed of their self-incriminatory effect, then all the decisions, which have freed those who were in jail because they refused to give answers to questions that were deemed self-incriminating, were wrongly decided. We must conclude that the contention, and not the long line of cases, is unsound.
It is further contended that the rule against self-incrimination is limited to criminal sanctions stemming from the same governmental entity and that the privilege of silence is not available when a threat of criminal proceedings stems from the laws of another governmental agency. If the word “sovereignty” is substituted for the word “agency” some authoritative support for the contention may be found. (See Feldman v. United States, supra, 322 U.S. 487 [64 S.Ct. 1082, 88 L.Ed. 1408, 154 A.L.R. 982].) Neither any authority, of which we are aware, nor any reason that has been brought or comes to our minds, justifies the conclusion that the county of Los Angeles is so independent of the State of California, that in spite of the protection afforded by the state Constitution a person may be required by a law of the county to make a declaration which may serve to convict him of a violation of a state law. If a different conclusion is to be reached when the violation is that of another agency, as, for example, an ordinance of a city in the county, let it be reached in a case involving such a violation. We are convinced that a *966 county ordinance may not, constitutionally, require a person to state a fact which might incriminate him with respect to a state created felony.
Some other contentions have .been made on the subject we have been discussing, but they are either disposed of by that which we have already said or do not, in our opinion, merit discussion here. We do desire to refer to three cases which, although not controlling on our question of state law, do constitute respectable authority. The first of these, chronologically speaking, is Alexander v. United States (1950), 181 F.2d 480, where, by a four to three decision after a hearing in bank, the United States Court of Appeals of the Ninth Circuit reversed several judgments of contempt imposed because the prisoners had refused to give answers to questions before a federal grand jury which answers would have revealed their knowledge of or familiarity with the Los Angeles Communist Party.
In Estes v. Potter (1950), 183 F.2d 865, the United States Court of Appeals, Fifth Circuit, reversed a judgment of contempt arising out of the refusal of the appellant "to answer questions first propounded to him at an examination being held by immigration authorities and which he was then ordered to answer by the federal District Court. The questions asked of the appellant were if he knew whether or not certain aliens were or had been communists. He declined to reply on the ground that his answer might incriminate him. This quotation from the opinion lends support to many statements we have made (p. 867): “We cannot agree that the matter is so simple. The answers to these questions in themselves may not have even tended toward the incrimination of appellant, but they may have been links in a chain of circumstantial evidence strong enough to convict him of a number of crimes; or such answers might well provide the means whereby such evidence could be discovered. Appellant’s claim of privilege rests upon a reasonable fear of prosecution under 18 U.S.C.A. § 2385, and the general prohibition against conspiracy to commit an offense against the United States, 18 U.S.C.A. § 371. The offenses defined in the foregoing statutes include at least the following: (1) Knowingly or wilfully advocating the overthrow of the government by force or violence; (2) Knowingly or wilfully abetting such advocacy or such overthrow; (3) Organizing a society, etc., which teaches, advocates, or encourages the overthrow of government by force or violence; (4) Helping or attempting to organize such a society; (5) *967 Becoming a member of any such society knowing its purposes; (6) Affiliating with any such society knowing its purpose; and (7) Conspiracy to do any of the foregoing.
“If the answers to the questions might tend to show that the appellant was a member of or affiliated with the Communist party, his fear of criminal prosecution was justified.”
A different result was reached by the United States Court of Appeals of the Tenth Circuit in the case of Blau v. United States (1950), 180 F.2d 103, and the conflict of this decision with the two we have just reviewed was given by the United States Supreme Court as one of the reasons it granted certiorari in the Blau case. (Blau v. United States (1950), 340 U.S. 159 [71 S.Ct. 223, 95 L.Ed. -].) The case follows the familiar pattern. Patricia Blau had been found guilty of contempt because, when called as a witness before a federal grand jury, and then before the federal judge, she refused to answer questions concerning her knowledge of the officers, etc. of the Communist Party of Colorado. The contempt judgment was reversed by the federal Supreme Court, the reasons for the reversal being set forth in one paragraph (95 L.Ed.-): “At the time petitioner was called before the grand jury, the Smith Act was on the statute books making it a crime among other things to advocate knowingly the desirability of overthrow of the Government by force or violence; to organize or help to organize any society or group which teaches, advocates or encourages such overthrow of the Government; or to be or become a member of such a group with knowledge of its purposes. These provisions made future prosecution of petitioner far more than ‘a mere imaginary possibility . . Mason v. United States, 244 U.S. 362, 366 [37 S.Ct. 621, 61 L.Ed. 1198]; she reasonably could fear that criminal charges might be brought against her if she admitted employment by the Communist Party or intimate knowledge of its workings. Whether such admissions by themselves would support a conviction under a criminal statute is immaterial. Answers to the questions asked by the grand jury would have furnished a link in the chain of evidence needed in a prosecution of petitioner for violation of (or conspiracy to violate) the Smith Act. Prior decisions of this court have clearly established that under such circumstances, the Constitution gives a witness the privilege of remaining silent. The attempt by the courts below to compel petitioner to testify runs counter to the Fifth Amendment as it has been interpreted from the beginning. ”
*968 In view of the conclusion we have reached, no good would be served by an expression of any views we may have upon the other attacks made upon the ordinance.
For the reasons given, the judgments appealed from are affirmed.
Shaw, P. J., and Stephens, J., concurred.
Appellant’s petition for a rehearing was denied March 27, 1951.